BRUCE HAGSHENAS, Plaintiff and Counterdefendant-Appellee and Cross-Appellant, v. ROBERT GAYLORD, JR., *et al.*, Defendants and Counter-plaintiffs-Appellants and Cross-Appellees.

Second District No. 2—88—0840

Opinion filed June 27, 1990.

William E. Gottfred, of Reese & Reese, of Rockford (Bernard P. Reese, Jr., of counsel), for appellants.

Roberta L. Holzwarth, of Holmstrom & Green, P.C., of Rockford (Richard D. Gaines, of counsel), for appellee.

JUSTICE DUNN delivered the opinion of the court:

Robert and Virginia Gaylord, and Imperial Travel, Ltd. (Imperial), appeal from the lower court's determination of damages in their successful suit against Bruce Hagshenas for breach of fiduciary duty. The lower court found that damages were too uncertain and, therefore, ordered an equitable remedy requiring Hagshenas to forfeit his shares of Imperial stock to Imperial and pay court costs. The Gaylords argue that damages were not too uncertain to be awarded. Hagshenas has filed a cross-appeal contesting liability. He contends the court erred in finding he breached a fiduciary duty in establishing a competing business even though he had resigned as an officer and director of Impe-

rial. For the reasons stated below, we affirm the finding of liability and reverse and remand the damage award.

This case was initiated on April 29, 1982, when Bruce Hagshenas (Bruce) sued for dissolution of Imperial based on the dissension and corporate deadlock between himself, a 50% shareholder, and Robert Gaylord (Robert) and Virginia Gaylord (Virginia), the other 50% shareholders. The Gaylords filed a counterclaim alleging breach of fiduciary duties and sought damages. The Gaylords filed on August 6, 1982, a motion for a temporary restraining order regarding the day-to-day operations of Imperial and for appointment of a receiver. On August 9, 1982, the trial court entered an order that enjoined the parties from interfering with each other in the business operation, entitled the parties to access to business records, required all checks to be signed by a Gaylord and a Hagshenas, and made procedures for handling the mail.

On October 2, 1982, Bruce and his wife, Barbara, resigned from Imperial as officers and directors. The following day they purchased a new agency and began competing with Imperial. On November 1, 1982, the Gaylords moved for a preliminary injunction to stop Bruce from competing with Imperial. On February 16, 1983, the court entered a preliminary injunction that ordered Bruce to deliver an irrevocable voting proxy of his stock and barred him from personally soliciting travel business from Imperial for one year.

In April 1983, the cause proceeded on Bruce's amended complaint for dissolution and on the Gaylords' amended complaint for damages for breach of fiduciary duty. On October 1, 1987, the trial court ruled Bruce failed to prove his case and found in favor of the Gaylords on their complaint for breach of fiduciary duty. The court found that damages were too inexact to be determined and therefore fashioned an equitable remedy, ordering Bruce to transfer his Imperial stock to Imperial to be held in constructive trust as treasury stock and voted on by the Gaylords. Bruce was also ordered to pay court costs.

The facts considered by the trial court consisted of evidence from the preliminary injunction hearing, the trial on the merits, and several written stipulations. Below is a summary of the relevant stipulations listed by the parties followed by other evidence relevant to Bruce's appeal of liability. We will address the damage evidence later in the context of discussing the Gaylords' appeal.

STIPULATIONS

(1) Imperial, an Illinois corporation, was purchased January 25, 1980, with all the outstanding shares divided equally between Bruce

Hagshenas and Robert Gaylord. Robert later conveyed one-half of his shares to his wife, Virginia. The board of directors was as follows: Virginia, president; Bruce, vice-president and assistant secretary; Barbara Hagshenas (Bruce's wife), secretary; and Robert, treasurer.

(2) Sales revenues for the 10 months ending July 31, 1982, were substantial, approximating $2 million.

(3) Imperial has been engaged in the travel agency business, a highly competitive industry where salespersons frequently establish and maintain personalized relationships with clients.

(4) Prior to October 2, 1982, Robert and Virginia were duly notified of a special meeting of the board of directors to be held on October 2, 1982, for the purpose of filling vacancies on the board, but they did not attend the meeting. Bruce and Barbara attended the meeting and submitted resignations from the board of directors to be effective immediately. Bruce also resigned as vice-president and assistant secretary.

(5) From prior to October 2, 1982, through the date of the execution of the stipulation, Bruce and Barbara have retained in their possession a key to the business office of Imperial.

(6) As of October 4, 1982, the following Imperial employees were engaged exclusively in sales: Cathy Detlof, Mary Jo Buthe, Michele Kling and Denise Oliver. Pamela Detlof was the office manager and had some sales responsibility. Gladys Lindsay was employed for bus tours only, and Rosemary Cleary was employed as a bookkeeper.

(7) On October 9, 1982, Pam Detlof resigned. Mary Jo Buthe submitted her resignation October 13, 1982, effective October 27, 1982. Cathy Detlof submitted her resignation October 15, 1982, effective October 29, 1982, and on October 26, 1982, Michele Kling submitted her resignation effective November 10, 1982.

(8) On October 6, 1982, Bruce and Barbara Hagshenas placed a blind "help wanted" ad that ran October 8 through 11 seeking travel agents with corporate and pleasure travel experience.

(9) On October 12, 1982, Bruce and Barbara held a meeting with their attorney and Pamela Detlof, Mary Jo Buthe, and Cathy Detlof, in which Bruce announced that he and Barbara had acquired Fare-Way Travel Agency, Inc. They soon after changed the name to Superior Travel, Inc. (Superior). Bruce told them that Pamela Detlof had been hired to work for them and then offered work to Cathy Detlof and Mary Jo Buthe.

(10) Michele Kling has been hired by Superior. Denise Oliver submitted her resignation November 1, 1982, effective November 15, 1982. She was fired by Virginia Gaylord at noon November 4, 1982.

(11) Since resigning from Imperial, Bruce has solicited customers of Imperial and has secured enough of Imperial's commercial customers to have a significant negative impact on Imperial's sales and profitability now and within the immediate future. In connection with his solicitation of Imperial's customers, Bruce made some or all of the following representations to some of the clients whose business he was soliciting on behalf of Superior: he was no longer involved in the direction of Imperial; he and his wife, Barbara, had opened a new travel agency; they had purchased new equipment; he could service their travel needs as cheap or cheaper than his competitors, including Imperial; Superior had hired the sales representatives who had serviced their accounts at Imperial; and he still retained an ownership interest in Imperial, but his partners or fellow shareholders were operating and managing its business.

(12) Bruce's attorney, Richard Gaines, wrote the Gaylords' attorney, Mike O'Brien, on October 1, 1982, and stated his client would agree to Imperial's purchase of another travel agency if it would be used to allow the parties to each take separate offices. In the absence of a vote by the Gaylords for Imperial to acquire a new agency, his client would feel free to acquire the agency personally. That day, O'Brien wrote Gaines to state that his clients objected to Bruce obtaining personally any competing travel agency and would pursue a cause of action for breach of fiduciary duty. On October 4, 1982, Gaines wrote to O'Brien and stated that his clients resigned after the Gaylords did not come to the October 2, 1982, meeting in which his clients had hoped to work out the parties' differences by discussing having Imperial purchase another travel agency. He also stated that his client, as a 50% shareholder of Imperial, opposed Imperial's purchase of another travel agency. In a letter written October 6, 1982, by Bruce to the Gaylords' attorneys, Bruce stated that, as he continued to own 50% of Imperial, he had a continued interest in its success. He outlined five specific areas of Imperial business and briefly stated how to service these areas.

## TESTIMONY

The day-to-day oversight of the business was handled primarily by Barbara and Virginia. Barbara testified that she and Virginia were in the office from January to November 1980. She said Bruce worked on outside corporate sales. By May 1981, she and Virginia had many differences, and the husbands took over the day-to-day operations. She came back to the office in the fall 1981, and Virginia came back in February 1982. By March, everyone's temper was flaring.

The parties produced a great deal of testimony covering the disputes that had developed between them. It is safe to say that, by spring 1982, the parties did not get along and did not trust each other. Below is an outline summary of the main disputes between the parties.

## DISPUTES

(1) *Mail Procedure*—For a substantial period of time after the purchase of Imperial, Virginia was solely responsible for mail coming to the company. She opened a post office box and only she had the combination. Bruce testified he told the Gaylords he wanted an end to this procedure. He and his wife complained that the mail had not been received for a couple weeks. Bruce had the post office box combination changed without Virginia's knowledge on two occasions.

(2) *Company Records*—Bruce testified Virginia was sensitive to questions about the company's records and would not let anyone see records pertaining to commission checks. Virginia testified that the Hagshenases stopped sending them the weekly owners' reports that had been routinely sent. Bruce and Barbara testified that these records were unnecessary because they merely reiterated already existing records.

(3) *Access to Office*—In March 1982, Virginia and Robert went to the office to look at some records and were ordered out of the office by Bruce. Bruce contends they were bothering employees and customers. Bruce called the police to remove them for trespassing. Bruce's attorney came and apologized to the Gaylords. Bruce had the locks on the office changed twice without the Gaylords' knowledge or approval. Barbara testified this was done to keep Virginia from taking records from the office.

(4) *Bruce's purchase of a pickup truck*—Robert testified he told Bruce he disapproved of his idea to buy a pickup truck to replace the old car they were using to deliver tickets to customers. He said Bruce told him he wanted to get a pickup truck so he could use it for his own personal use. Bruce denied saying this, but the truck was purchased over the Gaylords' objection.

(5) *Motor Coach Business*—The Gaylords disapproved of getting into the motor coach business, but Bruce went ahead and hired an employee to handle motor coach business exclusively.

(6) *Employee Raises, Advertising, Reimbursement Expenses to Owners*—Bruce testified he and his wife disagreed with the Gaylords on these subjects. Virginia stated she did not approve of employee raises.

(7) *Threat by Bruce*—Virginia testified that in February 1982 Bruce threatened that, if she and her husband did not sell their interest to them, he would sue for dissolution. Bruce denied this but admitted they had many disagreements.

(8) *Cash Skim Operation*—Barbara testified that all four directors were involved in a cash-skim operation involving commission checks and incoming cash. She stated Virginia would take large amounts of cash home with her. She saw Virginia give Bruce an amount of cash in Reno. She and Bruce testified they told the Gaylords they wanted to stop the operation on several occasions, and it was eventually stopped sometime in 1982. When Bruce was first asked about this by the Gaylords at trial, he was evasive and stated he did not know what was going on, but he had suspicions Virginia was skimming cash. In later testimony he admitted full knowledge and stated he was evasive earlier because he was surprised it was brought out. The Gaylords denied there was ever a cash-skim operation. Virginia stated she took cash to her home as part of an ongoing study of the cash receipts that was initiated after she discovered their first manager had been embezzling.

### OTHER TESTIMONY

Bruce and Barbara testified they did not seek out a new agency until October 3, 1982, and they made an informal agreement on that day, a Sunday, to buy the agency. The sales representatives who left Imperial testified they learned of the Hagshenases' resignations and purchase of a new agency after October 2, 1982. They were told not to transfer any accounts from Imperial to Superior. They were also told to give proper notice to Imperial and to offer to train any new personnel. Some of the sales employees testified they took with them to Superior their personal records they had kept on clients, including information of travel preferences and credit card numbers, but they did not take information stored on the company computer. Cathy Detlof stated she believed all the corporate clients the employees serviced at Imperial had come with them to Superior. Some of the sales employees stated they would not have stayed at Imperial after the Hagshenases resigned because they did not get along with Virginia.

Herman Johnson testified he was a commercial customer of Imperial's when he was contacted by Bruce, who told him Superior had been formed to handle commercial accounts exclusively and Imperial would still handle pleasure trips. Bruce never said the two companies were competing; Johnson believed they were both part of the same company. Bruce also told him he had made a special effort to get al-

most an identical phone number for Superior. Jan Marty, Pauline Finkbiner, and Lorraine Prell, who also represented Rockford companies that did business with Imperial, testified Bruce made essentially the same representations to them.

Shirley Crocks testified as a former commercial client of Imperial's. She stated Bruce told her he and his wife were resigning from Imperial and starting their own business. Theodore Klint and Charles Eck, also former clients of Imperial, testified Bruce told them he was starting his own separate business to compete with Imperial.

The Gaylords did not hire any replacements immediately after the Hagshenases resigned, nor did they attempt to solicit any business immediately after the resignations. Virginia explained that, with the employees gone, she did not have proper personnel to service clients and she did not think it would be fair to hire new employees while the dissolution suit was pending. By April 1983, the Gaylords had hired one qualified agent and had asked two close friends to work informally on sales.

### BRUCE HAGSHENAS' CROSS-APPEAL

■ Bruce argues the court erred in finding he owed a fiduciary duty to the Gaylords after he resigned as a director and officer of Imperial. He contends he was free to compete with Imperial once he resigned. Ordinarily, after a director or officer resigns from a corporation, he or she owes no fiduciary duty to that corporation. (*Dangeles v. Muhlenfeld* (1989), 191 Ill. App. 3d 791, 795-96; *Voss Engineering, Inc. v. Voss Industries, Inc.* (1985), 134 Ill. App. 3d 632, 638.) The Gaylords contend, however, that Bruce continued to owe a fiduciary duty similar to that of a partner since he continued to own half the stock of Imperial, a company that was essentially a close corporation.

In general, a mere owner of stock in a company does not owe a fiduciary duty to that company. The Business Corporation Act provides that "[a] holder of or subscriber to shares of a corporation shall be under no obligation to the corporation or its creditors with respect to such shares other than the obligation to pay the corporation the full consideration for which said shares were issued or to be issued." (Ill. Rev. Stat. 1981, ch. 32, par. 157.23.) In contrast to the Business Corporation Act, the Close Corporation Act provides that, where the articles of incorporation provide that the business of the corporation shall be managed by the shareholders of the corporation rather than by a board of directors, shareholders shall be deemed to be directors for purposes of the Business Corporation Act, and shareholders shall be subject to all liabilities of directors. (Ill. Rev. Stat. 1981, ch. 32,

pars. 1212(a)(2), (a)(3).) Bruce asserts that Imperial was not organized under the Close Corporation Act and does not fall under the Close Corporation Act definitions. The Gaylords have not argued otherwise. The record does not include the articles of incorporation or the shares of stock. Thus, we accept the assertion that Imperial is not a close corporation under the Close Corporation Act, and we do not apply this act to this case.

 █ This conclusion does not, however, end our inquiry on the subject of a fiduciary duty owed by a 50% shareholder in a small corporation such as Imperial. The Close Corporation Act provides that its provisions "shall not be deemed to repeal, amend or modify any statute or rule of common law which is or would be applicable to any corporation which is not a close corporation as herein defined." (Ill. Rev. Stat. 1981, ch. 32, par. 1216.) We believe that, though Imperial was not organized or registered as a close corporation under the Close Corporation Act, for all practical purposes it acted as a close corporation. In *Galler v. Galler* (1964), 32 Ill. 2d 16, 27, the supreme court defined a close corporation as "one in which the stock is held in a few hands, or in a few families, and wherein it is not at all, or only rarely, dealt in by buying or selling." Imperial meets this test. Its stock was equally split between Bruce and the Gaylords, and there was no buying or selling of this stock. We also find it significant that the shareholders elected themselves directors and officers and participated in the day-to-day operations.

 Therefore, though we do not apply the Close Corporation Act to this case, we will consider this case under common-law principles which have been applied to closely held corporations. In *Illinois Rockford Corp. v. Kulp* (1968), 41 Ill. 2d 215, the supreme court found that 50% shareholders of a company owed a fiduciary duty to each other similar to that of partners. In this case, plaintiff and defendant were each 50% shareholders of a small furniture company. The company fell on hard times, and defendant negotiated a sale of the company. He assured plaintiff they were both getting the same amount for their shares. It was clear, however, that defendant had negotiated a better deal for himself and had intentionally left plaintiff with the impression he was getting the same deal as defendant. (*Kulp*, 41 Ill. 2d at 218-21.) In finding defendant breached a fiduciary duty, the court first stated that it has consistently refused to set out the precise boundaries of whether a fiduciary duty exists. (41 Ill. 2d at 222.) It then stated:

> "A fiduciary relation exists in all cases in which a confidential relationship has been acquired. The origin of the confidence is

immaterial. It may be moral, social, domestic, or purely personal. [Citation.] In *Tilley v. Shippee*, 12 Ill. 2d 616, at page 624, we said: 'Their decision to form and operate as a corporation rather than a partnership does not change the fact that they were embarking on a joint enterprise, and their mutual obligations were similar to those of partners.' See also *Helms v. Duckworth* (D.C. Cir.), 249 F.2d 482; *Sher v. Sandler*, 325 Mass. 348, 90 N.E.2d 536." (41 Ill. 2d at 222.)

*Kulp* demonstrates that, in a closely held corporation, the mere fact that a business is run as a corporation rather than a partnership does not shield the business venturers from a fiduciary duty similar to that of true partners.

*Kulp* cited *Helms v. Duckworth* (D.C. Cir. 1957), 249 F.2d 482, a case that explicitly held that shareholders in a closely held corporation owe a fiduciary duty to the other shareholders. In *Helms*, the court found that defendant, a 49% shareholder who had equal voting rights in a close corporation, misrepresented himself in negotiating an agreement with plaintiff, a 51% shareholder in the corporation. The court held that, in an intimate business venture such as this, the stockholders of a close corporation occupy a position similar to joint adventurers and partners. (*Helms*, 249 F.2d at 486.) The court continued:

"While courts have sometimes declared stockholders 'do not bear toward each other that same relation of trust and confidence which prevails in partnerships,' this view ignores the practical realities of the organization and functioning of a small 'two man' corporation organized to carry on a small business enterprise in which the stockholders, directors and managers are the same persons. A distinguishing characteristic of such a corporation is the absence of a division between the stockholder-owners and the director-managers, for the former either personally manage and direct the business or so dominate the directors as to render the latter agents. Yet the fiduciary capacity of directors and dominant or controlling shareholders is unquestioned. *Pepper v. Litten*, 1939, 308 U.S. 295, 306, 60 S. Ct. 238, 84 L. Ed. 281. We believe that the holders of closely held stock in a corporation such as shown here owe a fiduciary duty to deal fairly, honestly, and openly with their fellow stockholders and to make disclosure of all essential information. 249 F.2d at 486-87.

The supreme court of Massachusetts has also held that shareholders in a closely held corporation owe a fiduciary duty toward each other similar to that of partners. (*Donahue v. Rodd Electrotype Co. of*

*New England, Inc.* (1975), 367 Mass. 578, 328 N.E.2d 505; see also Farnsworth, Recent Developments, Close Corporations: *Donahue v. Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 328 N.E.2d 505 (1975), 61 Cornell L. Rev. 986 (1976).) The court stated in *Donahue*:

> "Because of the fundamental resemblance of the close corporation to the partnership, the trust and confidence which are essential to this scale and manner of enterprise, and the inherent danger to minority interests in the close corporation, we hold that stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another. In our previous discussions, we have defined the standard of duty owed by partners to one another as the 'utmost good faith and loyalty.' [Citations.] Stockholders in close corporations must discharge their management and stockholder responsibilities in conformity with this strict good faith standard. They may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation."
> *Donahue*, 367 Mass. at 592-93, 328 N.E.2d at 515.

We find the positions stated in *Kulp, Helms* and *Donahue* persuasive in this case. In this case the facts demonstrate that, though Imperial was purchased as a corporation, it clearly was an enterprise closely resembling a partnership. Hagshenas and the Gaylords were not only equal 50% shareholders; they were the directors and officers of the company; they oversaw the day-to-day operations. A partner owes a duty to exercise the highest degree of honesty and good faith in the dealings and in handling of business assets, thereby prohibiting enhancement of personal interests at the expense of the interests of the enterprise. *Jaffe Commercial Finance Co. v. Harris* (1983), 119 Ill. App. 3d 136, 143.

We find Bruce, as a 50% shareholder in this closely held corporation, owed a fiduciary duty similar to a partner to Imperial and its shareholders. He violated his fiduciary duty when he opened a competing business and hired away all of Imperial's employees. The sales employees were of great significance to Imperial's success. It was obvious Imperial would lose the majority of its customers if the sales people left. This action clearly benefited Bruce at the expense of Imperial.

We are not persuaded that Bruce's resignation as an officer and director relieved him of his fiduciary duty. We recognize that, after his resignation, Bruce was not involved in sales, management, or other

Imperial day-to-day operations. By maintaining his 50% ownership interest, however, Bruce retained significant control over Imperial. Though the record does not contain the articles of incorporation or the bylaws, we presume Bruce maintained half the voting power of the corporation up until the time the court ordered him to file a voting proxy. He did not purport to give up this control when he resigned. After his resignation, he objected to Imperial buying a new agency, and, moreover, he continued his suit for dissolution.

In finding Bruce owed a fiduciary duty as a 50% shareholder in this closely held corporation, we recognize a significant difference between a shareholder of a closely held corporation and a shareholder of public stock. Unlike the holders of public stock, who can sell their stock when disagreements over management arise, shareholders in a small corporation do not usually have an available market to sell their shares. (*Galler*, 32 Ill. 2d at 27.) We find it implicit that people who enter into a small business enterprise, as in this case, place their trust and confidence in each other. Thus, we find support for finding a fiduciary duty from *Kulp* (41 Ill. 2d at 215), which held that a fiduciary relation exists in all cases in which a confidential relationship has been acquired. Bruce argues there can be no finding of trust and confidence in this case because the parties were openly hostile to each other by the time he resigned. The important point in time is not the time at which the parties' differences became irreconcilable but, rather, the time in which they entered into the business relationship. We find no evidence of hostility or mistrust between the parties when they entered this business.

The fact that the parties were in disagreement when Bruce began competing with Imperial does not excuse his conduct. The parties, being equal shareholders, were at each other's mercy. If there were problems that could not be resolved, then the proper course of action would have been to negotiate a sale or buy out of the shares or file for dissolution. We are aware that Bruce made an attempt to sell his shares and filed for dissolution. Until a final sale or order of dissolution, however, Bruce owed a fiduciary duty to Imperial. We also recognize the lower court denied Bruce's suit for dissolution. We offer no opinion as to whether the trial court properly denied this relief since Bruce has not appealed this decision.

Finally, we have reviewed the other cases cited by the trial court and the parties in their briefs. Though these cases involve factual patterns similar to the instant case, we find that they are inapplicable to this issue because they either do not address or fail to address adequately the issue of whether a shareholder in a closely held corpora-

tion owes a fiduciary duty. For instance, in *Zokoych v. Spalding* (1976), 36 Ill. App. 3d 654, cited by the trial court, the court stated that equal 50% shareholders in a company were in effect engaged in a partnership and thereby owed each other a duty of good faith. (*Zokoych*, 36 Ill. App. 3d at 664.) The court also found, however, that defendant was an officer and thus owed a fiduciary duty to the corporation and to plaintiff as its shareholder. (36 Ill. App. 3d at 664.) Thus, *Zokoych* is significantly distinguished from the instant case. Likewise in *Patient Care Services, S.C. v. Segal* (1975), 32 Ill. App. 3d 1021, cited by the Gaylords, the court found a breach of fiduciary duty based on defendant's status as an officer and did not address the fiduciary duty owed by a shareholder. In *Smith-Schrader Co. v. Smith* (1985), 136 Ill. App. 3d 571, cited by the Gaylords at oral argument, the court found liability for solicitation of employees based on the principle that an officer will be liable to the corporation after resignation for transactions completed after termination if they were founded on information acquired during the relationship. (*Smith-Schrader Co.*, 136 Ill. App. 3d at 578.) The court held that since the officer's relationship with the employees was established prior to resignation, the officer was liable for soliciting those employees. (*Smith-Schrader Co.*, 136 Ill. App. 3d at 578.) The Gaylords did not raise this argument below. Thus, it is waived. Moreover, this court rejected the holding in *Smith-Schrader Co.* in *Dangeles v. Muhlenfeld* (1989), 191 Ill. App. 3d 791, 796. Finally, in *Ellis & Marshall Associates, Inc. v. Marshall* (1973), 16 Ill. App. 3d 398, cited by Bruce, in which the court found no liability against an officer and 35% shareholder of a small corporation who resigned and competed with his former company, the court did not address the issue of whether the former officer owed a duty as a shareholder.

In his next issue, Bruce contests the court's findings that he breached his fiduciary duty as an officer and director prior to his resignation. The other findings found Bruce guilty of the following: (1) purchasing a pickup truck over the objection and without authorization of the Gaylords; (2) hiring employees without authorization; (3) failing to provide the Gaylords with the weekly owners' reports; (4) changing locks on the business twice and the post office box without the knowledge or consent of the Gaylords; and (5) transferring bank deposits without the Gaylords' approval.

■■■ We find no merit to Bruce's challenge that these findings are against the manifest weight of the evidence. A reviewing court will not reverse the findings of the lower court unless they are against the manifest weight of the evidence. (*Jaffe Commercial Fi-*

*nance Co. v. Harris* (1983), 119 Ill. App. 3d 136, 142.) There was sufficient evidence to prove all the above facts. Nor is there merit to Bruce's argument that these findings do not demonstrate a breach of fiduciary duty. Clearly, these acts do not demonstrate conduct of good faith and honesty.

Bruce also argues that his conduct is defensible given the conduct of the Gaylords and their ongoing disputes. We are not persuaded. We find no defensible reason for Bruce to purchase a pickup truck over the Gaylords' objection when the business had no need for a pickup truck. There is no defensible reason for twice changing the locks on the office. Barbara testified this was done because Virginia was taking files out of the office after work. Yet, there is no evidence that Virginia, as president of the company, should not have been taking these files. We find no defensible reason for failing to send weekly reports to the Gaylords. We find the fact that Virginia had sole control of the mail does not excuse Bruce's conduct of changing the post office box twice without the knowledge of the Gaylords. Finally, we find no defensible explanation for Bruce transferring the Rock River Savings account, an account that only Virginia signed on, into a certificate of deposit at a higher interest rate without Virginia's knowledge. That the account gained higher interest does not mitigate the fact that it was done without the knowledge or approval of the person who had signed on to the account.

Arguing that the doctrine of clean hands applies, Bruce also contends that the Gaylords cannot complain of his conduct because the Gaylords were involved in skimming cash from the company. We find it unnecessary to consider this contention because, assuming *arguendo* that a cash-skimming operation did exist, it is not in any way connected to the issues litigated. The doctrine of clean hands will only be applied where the alleged misconduct is connected to the matter in litigation. (*Patient Care Services v. Segal* (1975), 32 Ill. App. 3d 1021, 1033.) The Hagshenases stated that they had full knowledge of the scheme and participated in it. Though they stated they at times voiced their objection, they also testified that the scheme was stopped. They did not relate in their testimony how this concluded scheme had anything to do with the other conduct that occurred. Thus, it is not relevant to the litigation.

Since we have found that Bruce is also liable for breaching a fiduciary duty as a shareholder, we need not consider his argument that the above conduct does not alone support the relief ordered by the trial court.

GAYLORDS' APPEAL

The Gaylords contend the trial court erred in only awarding them Bruce's shares in the company. The trial court found damages were too uncertain to be awarded and devised an equitable remedy, ordering Hagshenas to turn over his shares and pay court costs. The Gaylords contend the evidence was sufficient to prove Imperial's worth on October 2, 1982, and, thus, damages were not too uncertain to be awarded.

Each party presented expert testimony to prove the worth of Imperial on October 2, 1982. Milton Miegs, a chartered financial analyst who has valued approximately 60 businesses, testified for the Gaylords that the company had a value of $438,100 on or about October 2, 1982. Douglas Koch, a financial appraiser who has appraised 30 to 35 businesses, testified for Hagshenas that the company had a cash-flow value of $80,300 but had a liquidation value of $101,000 on October 2, 1982. Both analysts testified they used a similar cash-flow method of valuation. The other two accepted methods of valuation, comparison of similar public market companies and comparison of a similar agency recently sold, could not be used in this case. Miegs and Koch explained the cash-flow method involves looking to the past performance of the company and the perception of the industry as a whole to arrive at a reasonable projection of future income. This amount is factored against a discount value, a value designated to reflect the perceived risk of the business, to arrive at present value. Koch explained the cash method determines a rate of return which a prudent investor would require to invest in the business.

Both analysts looked to the company's financial statements to determine its past history. Below is a chart of Miegs' tabulations from the financial statements. Koch's tabulations were similar. (Koch's minor deviations are not relevant to the analysts' differences).

| | Sales | Gross Profit | Pretax Profit |
|------|-------------|--------------|---------------|
| 1980 | $1,343.600 | $157,300 | $40,600 |
| 1981 | $2,783,100 | $249,000 | $110,300 |
| 1982 | $2,421,900 | $235,600 | $35,000 |

The analysts differed greatly on how they perceived the past history of the company. Miegs said since the company had experienced such a large increase in earnings from 1980 to 1981, the average of the three years would provide an accurate account of the past history. Koch, on the other hand, said that because the last three years were so inconsistently up and down, one should only look to the earnings from 1982. The average earnings over the three years were higher than the earnings for 1982. Thus, Miegs determined a higher history

of earnings than Koch.

The analysts also differed strongly on their estimation of future income. Miegs decided the most reasonable projection of future growth showed the company's income would grow equal to inflation estimated at 5% a year. Koch, to the contrary, did not estimate future growth because he felt it was too uncertain. Thus, Miegs' calculation used an income figure equal to 5% growth in five years, while Koch's calculation used only the income figure for 1982. Furthermore, Koch adjusted the 1982 income figure by subtracting $17,000. He stated this was necessary to reflect the sales work done by Bruce, who did not receive compensation for his work. Miegs disagreed with this. He stated if someone had been hired at a salary to do Bruce's work, one could assume sales would have been higher.

Next, the analysts vastly disagreed on the appropriate discount factor, which is the factor equivalent to the riskiness of the company. They both agreed that deregulation of the airline industry would make the travel agency industry more competitive and thus more risky. They also agreed that Imperial was a significant force in the Rockford market. Miegs stated it had 10% of the market. Koch estimated it was one of the top 10 agencies out of 30. They differed greatly, however, on whether Imperial would be able to withstand the competition. Miegs stated Imperial was well situated because it was well automated with computers and had experienced travel agents. Koch thought Imperial's future was much less certain. Koch noted the depressed Rockford area and also found significant that Imperial had lost its biggest corporate account in 1981, as well as two other significant corporate accounts in 1982. Koch found that the recent presence of two large Chicago agencies would pose greater difficulties for Imperial.

The analysts also differed on the use of a study that determined the risk of investing in small corporations. Koch believed that Miegs had failed to add a factor that reflected the added riskiness of smaller enterprises. Miegs did not understand how Koch arrived at this added factor. As a result, Miegs used a discount factor of 15% while Koch used a discount factor of 25%. The significance of these numbers is that the higher the number, the lower the estimated value of the company, hence, Miegs' opinion that Imperial had an October 2 value of $438,100 and Koch's opinion that it had a value of $80,300 at this time.

Though disagreeing as to its value on October 2, 1982, both analysts agreed that Imperial's value as of February 28, 1983, was only liquidation value because sales had dropped substantially. Miegs esti-

mated this value to be between $50,000 and $70,000. Koch estimated the value at $128,000. He stated the liquidation value went up since October 2, 1982, because the company had paid off some significant debts.

A trial court's determination of damages will not be reversed unless it is contrary to the manifest weight of the evidence. (*Zokoych v. Spalding* (1980), 84 Ill. App. 3d 661, 668.) The evidence the Gaylords presented goes to the fair-market value Imperial would have sold for before Hagshenas resigned. The Gaylords did not offer evidence to prove damages strictly on Imperial's lost profits. There was no testimony about Superior's profits after October 2, 1982. The Gaylords' expert, Miegs, however, took estimated future profits into account in arriving at Imperial's cash value on October 2. Thus, in our analysis we look to the standard our supreme court set out for awarding lost profit damages in *Midland Hotel Corp. v. Reuben H. Donnelley Corp.* (1987), 118 Ill. 2d 306, 315-16:

> "In order to recover lost profits, it is not necessary that the amount of loss be proven with absolute certainty. (*Vendo Co. v. Stoner* (1974), 58 Ill. 2d 289, 310.) Being merely prospective, such profits will, to some extent, be uncertain and incapable of calculation with mathematical precision. As such, '[a] recovery may be had for prospective profits when there are any criteria by which the probable profits can be estimated with reasonable certainty.' (*Barnett v. Caldwell Furniture Co.* (1917), 277 Ill. 286, 289.) However, recovery of lost profits cannot be based upon conjecture or sheer speculation. (*Weiland Tool & Manufacturing Co. v. Whitney* (1969), 44 Ill. 2d 105, 118.) It is necessary that the evidence afford a reasonable basis for the computation of damages; the defendant's breach must be plainly traceable to specific damages. Unless plaintiff can prove that the breach was the cause of lost profits, he is entitled to nominal damages only. (See *Harman v. Washington Fuel Co.* (1907), 228 Ill. 298, 301; 11 S. Williston, Contracts sec. 1345 (3d ed. 1968).) And since lost profits are frequently the result of several intersecting causes, it must be shown with a reasonable degree of certainty that the defendant's breach caused a specific portion of the lost profits."

The trial court had before it the vastly different opinions of two financial analysts. We do not find, however, that this fact makes the evidence too uncertain. We believe the trial court's decision that the evidence was too uncertain is against the manifest weight of the evidence. Both experts gave an opinion that was made according to

accepted financial practice. While their opinions have some uncertainty, we do not find that they are sheer speculation. Their opinions are based on sound criteria. They reviewed Imperial's past history for three years. They reviewed the local market and the national market for travel agencies, and they reviewed the riskiness of the small corporation market. We find the evidence of Imperial's value on October 2, 1982, and the evidence of Imperial's reduction in value by February 28, 1983, provided a reasonable basis for the trial court to award damages. The conclusion of the trial court that damages were too uncertain was error.

Bruce argues that damage to Imperial cannot be attributed to Superior. This is without merit. The evidence clearly shows that Imperial lost most of its customers to Superior as a result of the Imperial sales people going to Superior.

We reverse the trial court's decision ordering Bruce to turn over his shares and pay court costs and remand for a new decision on damages based on the evidence presented. We add that we find damages based on the reduction in Imperial's value to be an adequate remedy at law in this case. Therefore, we need not consider the Gaylords' argument for a constructive trust on Superior's profits. A constructive trust is an equitable remedy, and an equitable remedy will not be imposed when there is an adequate remedy at law. *Graham v. Mimms* (1982), 111 Ill. App. 3d 751, 769.

The Gaylords next argue the trial court erred in not awarding attorney fees for vexatious pleading. The Gaylords contend that Bruce's action for dissolution lacked good faith. We disagree. The parties' disagreements are well established. In light of these disagreements, we find the suit was made in good faith.

The Gaylords also argue the court erred in not imposing punitive damages. Punitive damages may be awarded where the defendant's actions are accompanied by aggravated circumstances such as wantonness, wilfulness, malice, fraud, oppression, violence and recklessness. (*Zokoych v. Spalding* (1976), 36 Ill. App. 3d 654, 671.) A trial court's decision as to whether to award punitive damages will not be reversed absent an abuse of discretion. (*Zokoych*, 36 Ill. App. 3d at 671.) The trial court's decision not to award punitive damages was not an abuse of discretion. Though Bruce's conduct is not condoned, it does not warrant punitive damages in this case. We note that Bruce first made an effort through his attorney to resolve the problems between the parties before deciding to resign and open a competing business.

In summary, we affirm the trial court's decision on liability, and

we reverse the trial court's award of equitable damages and remand the cause for a determination of damages based on the evidence.

Affirmed in part; reversed in part and remanded.

UNVERZAGT, P.J., and McLAREN, J., concur.