BILL ANEST, Plaintiff-Appellee, v. DAVID AUDINO, Defendant-Appellant.

Second District    No. 2—01—0599

Opinion filed July 12, 2002.—Rehearing denied August 9, 2002.

Theodore A. Woerthwein and John L. Miller, both of Woerthwein & Miller, of Chicago, for appellant.

John W. Quinn, of Churchill, Baumgartner & Quinn, Ltd., of Grayslake, and Mitchell M. Iseberg, of Chicago, for appellee.

JUSTICE CALLUM delivered the opinion of the court:

Plaintiff, Bill Anest, sued defendant, David Audino, for breach of a note and enforcement of a guaranty. Audino filed a counterclaim, alleging, *inter alia*, breach of fiduciary duty (count VI) and tortious interference with business expectancy (count VII). The trial court entered judgment for Anest on his claim and awarded him $130,000 in damages, $47,041 in attorney fees, and $1,634 in costs. Audino appeals the award of attorney fees, and we affirm on that issue. On Audino's counterclaim, Anest moved for a directed finding at the close of Audino's case in chief. The court granted Anest's motion, and Audino now appeals that ruling. We reverse the directed finding on Audino's counterclaim and remand the cause.

In 1995, Anest lent $80,000 to Intergroup Financial Corporation, Inc. (Intergroup). In exchange, Intergroup executed a note in favor of

Anest. The five shareholders of Intergroup, one of whom was Audino, executed a guaranty on the note. In September 1997, Anest sued Intergroup and the guarantors for breach of the note and enforcement of the guaranty. In January 1998, Anest obtained a default judgment against Audino. Anest subsequently levied against Audino's interest in another company, Precision Pour, L.L.C. (Precision Pour), and, in February 1999, purchased the interest at a sheriff's sale. On July 27, the trial court vacated the default judgment for want of service.

Precision Pour sold a product called the BLM 2000, a beer line cleaning device that replaces the manual cleaning of beverage lines with continuous radio waves. Precision Pour was the exclusive distributor of the device in the United States in 1997 and 1998 and was a nonexclusive sales agent in 1999.

Before Anest acquired an interest in the company, the members of Precision Pour were Audino, Leon Teichner, and William Schilling. Membership interests in Precision Pour were held as follows: Audino held a 23.33% interest; Teichner, 43.3%; and Schilling, 33.3%. The operating agreement of Precision Pour defines a membership interest as a right to participate in the profits and losses of the entity, in addition to the right to vote on, or consent to, management decisions. A membership interest is distinguished from an economic interest, which affords the holder merely a right to the profits and losses of the company.

After Anest acquired Audino's interest in Precision Pour, the following actions were taken on behalf of the company. On June 18, Anest, Teichner, and Schilling executed a "Resolution of Precision Pour, L.L.C." that stated as follows. Schilling and Teichner converted their accrued, but unpaid, salaries into capital. Accordingly, their interests in the entity increased to 41% and 54% respectively, and Anest's (formerly Audino's) interest was diluted to 5%. The resolution described Anest's interest as an economic interest.

On July 13, Anest, Teichner, and Schilling executed a "Memorandum of Understanding" that amended the operating agreement as follows. Precision Pour was insolvent and desired additional capital. Anest was willing to purchase membership units in the company and to lend it money. Thus, Anest bought an 18.3% membership interest from the entity and an additional 1.67% membership interest from Schilling. He also lent Precision Pour $59,166.67. Teichner and Schilling permitted Anest to convert his 5% economic interest (the diluted interest that was formerly Audino's) into a membership interest. In sum, the document states that Anest held a 25% membership interest in Precision Pour. In addition to the monetary transactions, the resolution altered the management structure of Precision Pour in that the

company changed from a *manager*-managed limited liability company to a *member*-managed limited liability company. The memorandum also stated that the parties agreed to permit Schilling to transfer up to 6.77% of his interest to Anest and to permit Anest to transfer up to one-half of his interest to Mitchell Iseberg, his attorney.

On July 14, Schilling and Teichner executed an "Amendment to Memorandum of Understanding." The resolution contains a provision entitled "Company Obligation to Repurchase," which states that, if a court voids the sheriff's sale or otherwise returns Audino's original interest in Precision Pour, and if the dilution of Audino's interest is also invalidated, then the company (1) will repurchase the interest that Anest purchased from Precision Pour and (2) repay the loan from Anest. The resolution also contains a provision entitled "Anest Right to Purchase," which states that, if Audino reacquires his "5% diluted interest," Schilling will convey to Anest a 5% interest in the company for $4,286.33. Moreover, if Anest subsequently reacquires his diluted interest by court order, Anest will reconvey the interest to Schilling for the same consideration.

On September 14, the trial court vacated the sheriff's sale, ordering that Audino's interest in Precision Pour "is restored as if said Sheriff's Sale(s) had never taken place."

A Precision Pour consent dated September 15 lists Audino as a 5% membership interest holder in the company and lists Anest as a 20% holder. A company consent dated September 16 sets forth the membership distribution on that date as follows: Teichner, 43$\frac{1}{3}$ units; Schilling, 26$\frac{2}{3}$ units; Iseberg, 12$\frac{1}{2}$ units; Anest, 12$\frac{1}{2}$ units; and Audino, 5 units.

On October 29, the office of Ronald Panter, Precision Pour's attorney, faxed a notice of an "emergency meeting" of Precision Pour to Audino's attorney, John Miller. The notice stated that the purpose of the meeting was "to discuss changing the business relationship of the company from a nonexclusive distributor to an importer and the ramifications thereof." It stated that the meeting would be held on November 1. Section 7.3 of the operating agreement of Precision Pour states that at least five days' notice must be provided to members before a membership meeting. Section 7.4 of the agreement permits a waiver of the notice requirement only with unanimous member consent. The agreement does not address facsimile notice.

On November 1, Anest, Teichner, Schilling, Iseberg, Panter, and one of Panter's associates attended the emergency meeting of Precision Pour. Teichner testified that during the meeting a call was made to Miller's office and Miller stated that Audino would not attend the meeting. Teichner and Anest testified that during the meeting the

parties discussed an offer from BLM International, Limited, the holder of the patent for the BLM 2000, for a five-year exclusive distributorship agreement. Teichner testified that the offer had to be acted upon no later than November 1 and that Anest was aware of this deadline.

Teichner testified that BLM International was concerned about Precision Pour's financial ability and requested a letter of credit to guarantee the purchase of a certain number of units of the BLM 2000. Teichner stated that in October 1999 Precision Pour was insolvent. He testified that Iseberg relayed the following financial information about Precision Pour during the meeting. The company had depleted the loan from Anest. It had current payables of $40,000 and needed additional working capital in the amount of $60,000 to continue business. Teichner testified that a vote was taken during the meeting as to whether the members would contribute to the company their proportionate shares of a $100,000 capital contribution and the funds to secure an $850,000 letter of credit in order to obtain the exclusive distributorship offer. The members voted against making any such contributions.

After the emergency meeting of Precision Pour, Teichner testified that another meeting took place among Anest, Teichner, and Schilling, at which they agreed to exercise the exclusive distributorship offer. Thus, on December 9, BLM Technologies, L.L.C. (BLM Technologies), was formed. The members of BLM Technologies and their percentage interests are as follows: Anest, 40%; Iseberg, 10%; Schilling, 25%; and Teichner, 25%. Anest was the company's manager, and he testified that he put up the necessary funds to secure the letter of credit required for BLM Technologies to become the exclusive distributor of the BLM 2000 in the United States and Canada.

Audino testified that his original position with Precision Pour was to secure financing for the company. He stated that he had raised slightly under $1 billion for various entities from 1988 through 2000 and that he secured a letter of credit for one of Precision Pour's clients to purchase BLM 2000 devices from the company. Audino stated that he was not asked to raise any funds for Precision Pour during the fall of 1999.

James Donoval, an accountant and attorney, testified that he was hired by Audino to obtain regulatory approvals for the use of the BLM 2000 in Illinois. He stated that the first part of the two-step process was accomplished in that the applicable regulation was changed. However, he testified that the second step—approval of the BLM 2000 by a state liquor commission—was not completed. Audino testified that Schilling worked with Coors Brewing Company (Coors) to begin Coors' testing of the BLM 2000 for its draft beer facilities. Teichner

testified that Coors notified Precision Pour on May 3, 1999, that it had completed the initial testing of the BLM 2000 at its own cost but that Coors did not complete its testing until March 9, 2000.

Audino's counterclaim alleged, *inter alia,* a breach of Anest's fiduciary duty to Audino (count VI) and tortious interference with Audino's business expectancy (count VII).

In count VI, Audino argued that members of a limited liability company are like shareholders in a close corporation and partners in a partnership in that each owes fiduciary duties to the entity and to each other. He argued that, because he and Anest were both members of Precision Pour on November 1, Anest owed a fiduciary duty to Audino and that Anest breached this duty. He asserted that the BLM 2000 represented a corporate opportunity of Precision Pour and that Anest breached his fiduciary duty to Audino when the opportunity was not presented to Audino due to the untimely notice and the failure to disclose the purpose of the meeting accurately in the notice. Audino also argued that Anest was foreclosed from exploiting the opportunity—forming BLM Technologies and accepting the offer—regardless of the financial condition of Precision Pour.

In count VII, Audino argued that the breach served as the basis for a tortious-interference-with-business-expectancy claim in that he had a valid expectancy in the BLM 2000; that Anest knew of the device; and that Anest's leading role in forming and financing BLM Technologies was a violation of his fiduciary duty to Audino and constituted a diversion of Audino's business opportunity.

Audino argued that he lost out on any increase in the value of his membership interest in Precision Pour. Audino requested a constructive trust over Anest's interest, an accounting, and compensatory and punitive damages.

On November 21, 2000, the trial court granted Anest's motion for a directed finding on counts I through V of Audino's counterclaim and on Audino's request in counts VI and VII for a rescission of the exclusive distributorship held by BLM Technologies and for a return of "assets improperly transferred from Precision Pour." Counts I through V and the requests for a rescission and a return of assets in counts VI and VII are not at issue in this appeal.

On December 19, 2000, the trial court granted Anest's motion for a directed finding on counts VI and VII. In ruling on the fiduciary duty count, the court held that, because Anest did not have control over the daily operations of Precision Pour or otherwise have management-like responsibilities, Anest did not owe Audino any fiduciary duty. The court also held that there was no misdirection of corporate assets because Precision Pour did not have the financial

ability to act upon the business opportunity. The court stated that, even if Anest owed a fiduciary duty to Audino, such duty was not breached because Precision Pour was unable to act upon the offer on November 1. With respect to the tortious interference count, the court ruled that neither Audino nor Precision Pour had a valid business expectancy in the offer of an exclusive distributorship because the company was unable to realize that expectancy. The court also stated that monetary damages were not established.

With respect to Anest's original claim for breach of a note and enforcement of a guaranty, the court granted judgment in favor of Anest, awarding him $130,000 in damages, $47,041 in attorney fees, and $1,634 in costs.

Audino now appeals the trial court's (1) grant of Anest's motion for a directed finding on counts VI (breach of fiduciary duty to Audino) and VII (tortious interference with business expectancy) of Audino's counterclaim; and (2) award of attorney fees to Anest.

### I. Fiduciary Duty and Tortious Interference Counts

We address first the trial court's grant of Anest's motion for a directed finding.

■ When considering a motion for a directed finding in a bench trial, a trial court determines whether the plaintiff has made out a *prima facie* case and then weighs the evidence, including that which favors the defendant. *Orbeta v. Gomez*, 315 Ill. App. 3d 687, 690 (2000). A reviewing court will not reverse a trial court's determination of a motion for a directed finding unless it is contrary to the manifest weight of the evidence. *Orbeta*, 315 Ill. App. 3d at 690. A trial court's judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when its findings appear to be unreasonable, arbitrary, or not based on the evidence. *Judgment Services Corp. v. Sullivan*, 321 Ill. App. 3d 151, 154 (2001).

### A. Existence of Fiduciary Duty

Counts VI and VII are both premised on the existence of a fiduciary duty and a breach thereof. Audino argues that Anest owed him a fiduciary duty as a fellow member of Precision Pour. He cites for the first time on appeal section 15—3 of the Limited Liability Company Act (the Act) (805 ILCS 180/15—3 (West 2000)), which states that members in a member-managed limited liability company owe to each other the fiduciary duties of loyalty and care. We note that section 15—3 applies to all limited liability companies as of January 1, 2000. 805 ILCS 180/55—15(b) (West 2000). The Act was amended effective January 1, 1998, to include the fiduciary duties described above. Pub. Act 90—424, eff. January 1, 1998 (1997 amendments). Before January

1, 2000, an entity in existence on January 1, 1998, was required to elect to be governed by the 1997 amendments to the Act. 805 ILCS 180/55—15(a) (West 2000). Thus, during the relevant period here, there was no direct statutory basis to assert the existence of fiduciary duties between members of limited liability companies.

Because Audino has presented no evidence that Precision Pour elected to be governed by the amended Act, we address the fiduciary duty issue by reference to the Act as it existed prior to amendment.

■ Prior to amendment, section 10—10 of the Act, entitled "Liability of members and managers," stated as follows:

"(a) A member of a limited liability company shall be personally liable for any act, debt, obligation, or liability of the limited liability company or another member or manager to the extent that a shareholder of an Illinois business corporation is liable in analogous circumstances under Illinois law.

(b) A manager of a limited liability company shall be personally liable for any act, debt, obligation, or liability of the limited liability company or another manager or member to the extent that a director of an Illinois business corporation is liable in analogous circumstances under Illinois law." 805 ILCS 180/10—10(a) (West 1996) (amended by Pub. Act 90—424, eff. January 1, 1998).

This provision instructs us to review the law of corporations to determine whether there existed any fiduciary duties between the parties in this cause.

■ Individuals who control corporations owe a fiduciary duty to their corporations and their shareholders. *Kerrigan v. Unity Savings Ass'n*, 58 Ill. 2d 20, 27 (1974); *Levy v. Markal Sales Corp.*, 268 Ill. App. 3d 355, 364 (1994); *Graham v. Mimms*, 111 Ill. App. 3d 751, 761 (1982). Directors and officers of a corporation have a duty " 'to deal openly and honestly' with each other [citation], and to 'exercise the utmost good faith and honesty in all dealings and transactions' ***. [Citation.]" *Levy*, 268 Ill. App. 3d at 365.

■ Shareholders in a close corporation owe to each other fiduciary duties similar to those of partners in a partnership. *Hagshenas v. Gaylord*, 199 Ill. App. 3d 60, 71 (1990) (50% shareholder owed fiduciary duties to fellow shareholders). They owe a duty of loyalty to the corporation and to other shareholders. *Hagshenas*, 199 Ill. App. 3d at 71. Minority shareholders may owe a duty of loyalty to a close corporation under certain circumstances. *Rexford Rand Corp. v. Ancel*, 58 F.3d 1215, 1219 (7th Cir. 1995) ("Minority shareholders have an obligation as *de facto* partners in a joint venture not to do damage to the corporate interests").

■ As set forth in the September 16 Precision Pour consent, Anest

held a 12¹/₂% membership interest in the company and was a creditor of the company. Though Anest held a minority interest, Precision Pour was a member-managed entity effective as of July 13, 1999. Thus, Anest was more than a minority shareholder; he had management responsibilities in the company. His role in the entity was, like that of his fellow members, akin to that of an officer or director in a corporation. Officers and directors in a corporation owe fiduciary duties to shareholders and to the corporation. *Kerrigan*, 58 Ill. 2d at 27; see also 805 ILCS 180/10—10(b) (West 1996) (amended by Pub. Act 90—424, eff. January 1, 1998). We hold that it was against the manifest weight of the evidence for the trial court to conclude at the directed finding stage that Anest did not owe any fiduciary duty to Audino.

### B. Breach of Fiduciary Duty

Having found a *prima facie* case that Anest owed a fiduciary duty to Audino, we must next determine whether he breached that duty.

Audino argues that Anest breached his fiduciary duty to him by usurping the corporate opportunity presented by BLM International—the exclusive distributorship offer. Audino argues first that the opportunity was developed with Precision Pour's assets and, thus, could not be appropriated by Anest, even if the company lacked the financial capacity to take advantage of the opportunity. He argues second that the opportunity was not properly tendered to Precision Pour, as the subject of the meeting was not disclosed to him and the meeting itself was called with improper notice.

Anest maintains that there was no evidence presented that Precision Pour's assets were used to develop the exclusive distributorship offer. He states that he was under no obligation at the November 1 meeting to provide the financing for Precision Pour to accept the offer so that Audino could participate in the new venture. Anest also maintains that the best notice practicable was given.

We note initially that both parties address the breach issue by citing cases examining the corporate opportunity doctrine. Although we found no cases analyzing this issue, commentators generally assume that members and managers of limited liability companies may not divert company opportunities. See S. Glover, *Joint Ventures and Opportunity Doctrine Problems*, 9 No. 11 Insights 9, 15 (1995) (citing sources); see also *Froelich v. Erickson*, 96 F. Supp. 2d 507, 526 (D. Md. 2000) (assuming, without deciding, that the doctrine applies to limited liability companies), *aff'd*, *Froelich v. Senior Campus Living, LLC*, 5 Fed. Appx. 287 (4th Cir. 2001).

The corporate opportunity doctrine provides that a fiduciary cannot usurp a business opportunity that was developed through the

use of corporate assets. *Dremco, Inc. v. South Chapel Hills Gardens, Inc.*, 274 Ill. App. 3d 534, 537 (1995); *Graham*, 111 Ill. App. 3d at 763. The doctrine prohibits a corporation's fiduciary from taking advantage of business opportunities that are considered as "belonging" to the entity. *Levy*, 268 Ill. App. 3d at 365; *E.J. McKernan Co. v. Gregory*, 252 Ill. App. 3d 514, 529 (1993); *Graham*, 111 Ill. App. 3d at 762. A corporate opportunity is defined as a "proposed activity [that] is reasonably incident to the corporation's present or prospective business and *** in which the corporation has the capacity to engage." *Dremco*, 274 Ill. App. 3d at 538. When a corporate fiduciary wants to take advantage of a business opportunity that is within the company's line of business, the fiduciary must first disclose and tender the opportunity to the corporation before he or she takes advantage of it, notwithstanding the fiduciary's belief that the corporation is legally or financially incapable of taking advantage of the opportunity. *Graham*, 111 Ill. App. 3d at 765.

The evidence establishes that the distributorship offer was developed with Precision Pour's assets. Precision Pour was involved in many capacities in promoting the BLM 2000. Donoval testified that he was hired by Audino to obtain regulatory approval for the use of the device in Illinois and that he completed the first step in the two-step process. In 1997 and 1998, Precision Pour was the exclusive distributor of the BLM 2000 in the United States and, in 1999, was a nonexclusive sales agent. Audino testified that Schilling worked with Coors while Coors tested the device for its distributors.

■ As we described above, a corporate opportunity is one that is reasonably incident to an entity's present or prospective business and is one in which the entity can engage. *Dremco*, 274 Ill. App. 3d at 538. In *Graham*, the court stated that "it is relevant to consider whether it was feasible for the corporation to take advantage of the opportunity." *Graham*, 111 Ill. App. 3d at 763. The court continued that, "[n]evertheless, the 'core principle' of the corporate opportunity doctrine is that a corporation's fiduciary will not be permitted to usurp a business opportunity which was developed through the use of corporate assets." Thus, when corporate assets are used to develop an opportunity, "the fiduciary is estopped from denying that the resulting opportunity belongs to the corporation whose assets were misappropriated, even if it was not feasible for the corporation to pursue the opportunity or it had no expectancy in the project." *Graham*, 111 Ill. App. 3d at 763.

■ Here, the trial court ruled that there was no breach of any fiduciary duty because it found that Precision Pour was financially incapable of accepting the distributorship offer. However, in light of *Graham*, that factor does not control. Thus, we find that the court's ruling was against the manifest weight of the evidence.

Though the trial court did not reach the issue, we observe also that the opportunity was not properly disclosed and tendered. Here, the so-called emergency meeting was called with a notice that admittedly violated the Precision Pour operating agreement. Furthermore, we believe that a five-day notice could have been given and the opportunity properly described because the offer was still available on December 9, when BLM Technologies accepted it.

## C. Damages

The trial court found that Audino did not establish any monetary damages. In addition to monetary damages, Audino requested an accounting and a constructive trust in counts VI and VII of his counterclaim. However, the court did not address these requests in its ruling. On remand, if the court rules in Audino's favor, it should consider these alternative forms of relief.

In sum, on counts VI and VII of Audino's counterclaim, we reverse the trial court's grant of Anest's motion for a directed finding and remand the cause.

## II. Fee Award

The final issue we must decide involves the award of attorney fees on Anest's original claim for breach of the note and enforcement of the guaranty.

We will not vacate an award of attorney fees without a showing of an abuse of discretion by the trial court. *De Fontaine v. Passalino*, 222 Ill. App. 3d 1018, 1034 (1991). An abuse of discretion occurs when no reasonable person would take the trial court's view. *Nasrallah v. Davilla*, 326 Ill. App. 3d 1036, 1042 (2001).

Audino argues that the trial court erred in awarding Anest attorney fees because there was no evidence presented that the fees were paid by Anest himself. Anest maintains that the bills presented to the court in his fee petition show that they were mailed to "Mr. Anest c/o S & S Petroleum Products" and that this is not sufficient for us to infer that the company paid the bills.

The trial court stated that it based its ruling on language in the note, which states that Anest is entitled to attorney fees and costs that he "incurred" in the transaction. The court stated that neither the note nor the guaranty contained a requirement that Anest "incurred and paid" the fees. We agree.

Contractual provisions for attorney fees must be strictly construed, and a court must determine the intention of the parties. *Tomlinson v. Dartmoor Construction Corp.*, 268 Ill. App. 3d 677, 687 (1994). However, where a court is able to determine the meaning of the language in a contract, the express provisions govern and no further

construction or inquiry as to intent is necessary. *Brzozowski v. Northern Trust Co.*, 248 Ill. App. 3d 95, 99 (1993).

The word "incur" means, in relevant part, "[t]o become liable or subject to, to bring down upon oneself, as to incur debt." Black's Law Dictionary 768 (6th ed. 1990). We find that the contractual language is clear and that whether Anest paid the fees is irrelevant.

Audino urges us to consider *Label Printers v. Pflug*, 246 Ill. App. 3d 435 (1993), where the court refused to award attorney fees that were incurred by plaintiff but paid by his employer.

We find *Label Printers* distinguishable because it involved a statute that authorized a party aggrieved by the wrongful entry of a preliminary injunction to receive the damages he suffered as a result. The court found that the defendant was not entitled to recover attorney fees, when the defendant's representation was provided as a gratuity by his employer.

Here, the parties contracted for the payment of attorney fees "incurred" and, as we have already stated, the language in the contract is clear. For these reasons, we find that the court's award of attorney fees to Anest was not an abuse of its discretion.

To summarize, we affirm the court's award of attorney fees on Anest's original claim for breach of a note and enforcement of a guaranty. With respect to counts VI and VII of Audino's counterclaim, we reverse the court's grant of Anest's motion for a directed finding, and we remand the cause "with directions to proceed as though the motion [for a directed finding] had been denied by the trial court or waived." 155 Ill. 2d R. 366(b)(3)(iii). Thus, the judgment of the circuit court of Lake County is affirmed in part and reversed in part, and the cause is remanded with directions.

Affirmed in part and reversed in part; cause remanded with directions.

BOWMAN and KAPALA, JJ., concur.