2026 IL App (1st) 250908

SECOND DIVISION
March 31, 2026

No. 1-25-0908

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | |
|---|---|
| ALAN KAZEMI, | ) |
| | ) |
|    Plaintiff-Appellee, | ) |
| | ) |
|      v. | ) |
| | )   Appeal from |
| MARON ELECTRIC COMPANY and ERIC NIXON, | )   the Circuit Court |
| | )   of Cook County |
|    Defendants-Appellants | ) |
| _____ | )   20L11306 |
| | ) |
| MARON ELECTRIC COMPANY, | )   Honorable |
| | )   Scott D. McKenna, |
|    Counterplaintiff-Appellant, | )   Judge Presiding |
| | ) |
|      v. | ) |
| | ) |
| ALAN KAZEMI, | ) |
| | ) |
|    Counterdefendant-Appellee. | ) |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Van Tine and Justice D.B. Walker concurred in the judgment.

**O R D E R**

¶ 1 *Held*: Judgment on breach of contract and breach of fiduciary duty claims which included punitive damages against closely-held company and majority owner/CEO affirmed where majority owner/CEO manipulated company valuation to entirely negate minority shareholder's buyout. Manifest weight of evidence did not support company's counterclaim that minority shareholder had breached his fiduciary duty by soliciting an employee to join him at a competing company.

¶ 2    The majority owner and CEO of Maron Electric Company, Jerrold H. "Jerry" Nixon, was terminally ill when he implemented a succession plan for his closely-held commercial contracting business in which his son, Eric Nixon, and a long term, key employee, Alan Kazemi, would be the majority and minority shareholders. A shareholders' agreement provided that if Kazemi continued working for at least five full years, the company would pay him some of its net worth when he left. Ten years later, Maron was highly successful, Kazemi was entitled to millions, and Kazemi resigned. However, at Eric's direction, Maron's CFO, Donald J. Schwartz, secretly spent weeks "brainstorm[ing]" with the company's accountants to invent "contingent liabilities" that reduced Kazemi's buyout to $0. Kazemi sued for breach of contract and breach of fiduciary duty. Maron and Eric denied any wrongdoing, contending that Maron complied with its obligation under the shareholders' agreement to "direct" its accountants to perform a "binding and conclusive" valuation. Maron also countersued, claiming that Kazemi solicited a Maron employee to resign from the company with him. The claims were tried, Kazemi prevailed, and he was awarded $6.3 million in compensatory damages pursuant to the buyout formula and $4.1 million in punitive damages, which consisted mostly of attorney fees. Maron and Eric present more than a dozen reasons for us to vacate and enter judgment in their favor.

¶ 3    Kazemi testified that he immigrated from Iran in his teens, completed high school and then earned a degree in electrical engineering. He was toiling as an entry-level electrical draftsman during the construction of 900 North Michigan Avenue when his hard work was noticed by one of Maron's employees. Maron was a preeminent commercial electrical contractor in the Chicago area and its CEO, Jerry, was "an icon in the industry." Maron gave Kazemi a 40% pay raise and with Jerry as his mentor, Kazemi moved up through the ranks at Maron. The company had focused

almost entirely on new construction, but when Kazemi was promoted to project manager and had to bring in clients, he pursued remodeling work or what the industry termed as interior work. His efforts were very profitable for Maron and by 2002, he was an executive vice president.

¶ 4 In 2008, Jerry told Maron's executives that he had incurable cancer and a succession plan for when he and CFO Schwartz were no longer running the company. Jerry wanted his son, Eric, and Kazemi to head Maron. He also wanted Kazemi to have a minority ownership interest in the business (like Schwartz) and a financial incentive to stay long term. Jerry did not consult with his son about offering these terms to Kazemi. In February 2009, when Kazemi was 47 years old, he, Jerry, Schwartz, and attorney Robert Neiman, as trustee and on behalf of other trustees, signed the "Menlo Agreement" which sold 25 shares of stock (10% of the company) to Kazemi for $150,000. Jerry died six days later.

¶ 5 The Menlo Agreement included formulas for calculating the repurchase price of Kazemi's shares when he "cease[d] to be an employee of the Company, for any reason." During the first five years of the contract, the company's only obligation was to buy back its shares for $150,000:

> "In the event that Kazemi shall cease to be an employee of the Company, for any reason, other than a sale of the Company, in the first five years of his becoming a Shareholder hereunder, the Company shall purchase all (and not less than all) of the stock then owned by Kazemi for the amount he has actually paid in cash, payable within one hundred twenty (120) days after the termination date."

¶ 6 During the sixth year, however, Kazemi was entitled to the $150,000 and 50% of the value of his shares, and in each subsequent year, he was entitled to an additional 10% of the value, with the compensation capping out at 100%. The shareholders' agreement stated:

"In the event that Kazemi shall cease to be an employee, any time after the first five years, the Company shall purchase all (and not less than all) of the stock then owned by Kazemi. The purchase price per share shall be fifty percent of the computation of the Value Per Share set forth below (the 'Net Worth') plus ten percent (10%) of the Net Worth multiplied by the number of full years that have passed since the 5th anniversary date; provided that in no event shall the purchase price per share be more than one hundred percent (100%) of the Net Worth. In the event of a termination of employment, the Company shall direct its regularly employed accountants to perform the calculations necessary to determine the Value Per Share. The Value Per Share determined pursuant to this Agreement shall be binding and conclusive upon all parties hereto. Payment shall be made to Kazemi in three equal annual installments.

Computation of the Value Per Share. The '*Value Per Share*' shall mean the quotient of (x) the Net Worth of the Company as of the termination date ('Valuation Date'), divided by (y) the number of issued and outstanding Shares of the Company as of the Valuation Date. The term 'Net Worth' shall be an amount equal to the amount of the Company's assets, less the amount of its liabilities as disclosed by the Company's books of account regularly maintained in accordance with generally accepted accounting principles consistently applied but adjusted as follows:

* * *

(2) No adjustment shall be made on account of any event occurring subsequent to the Valuation Date ***;

(3) Reserves for contingent liabilities shall be treated as liabilities[.]"

¶ 7    Kazemi had purchased 10% of the company's shares and his percentage increased gradually to 11.27% as Schwartz retired his shares over approximately 10 or 11 years.

¶ 8    In 2018, which was the last full year before Kazemi resigned, Maron's financial statements showed annual revenues of over $84 million. The shareholders' agreement had been in effect for more than 10 years and Kazemi had grown unhappy at Maron under Eric's leadership, so he decided to find a new job during the summer of 2019. Between April and July 2019, Kazemi was drafting employment agreements for himself and a Maron project manager, Jason Pore, to join a newly formed company called Gurtz Interiors. Frank Gurtz's existing company, Gurtz Electric, was one of Maron's long term competitors. Kazemi was also preparing Maron's bid for a Goldman Sachs project in which Pepper Construction would be the general contractor. After 33 years with Maron, he gave notice to Eric on Friday, August 9th and proposed that they keep quiet about the resignation while Maron was bidding on a project for Bank of America. On the following Monday, however, Eric began questioning Maron employees one-on-one about whether they were also leaving and learned that Pore would also be resigning. The Bank of America bid was completed on Thursday, August 22nd, and Kazemi left the next day. The following Monday he was working at the new remodeling company. He prepared Gurtz Interiors' competing bid for the Goldman Sachs project and it won the $2.6 million contract.

¶ 9    After Kazemi left, Schwartz repeatedly tried to get him to sign a shareholders' agreement that did not include any compensation for Maron's net worth, would change the payment schedule from three years to 10 years, and added noncompete and nonsolicitation language. Schwartz had actually been trying to get Kazemi's signature since January 2019, just before Kazemi's 10th year as a shareholder started.

¶ 10    Katie Benson testified that the contract that Schwartz was trying to get Kazemi to sign in early 2019 had its genesis in the late summer or early fall of 2018. Benson was Eric's assistant at the time and he asked her to set up a call between himself, Schwartz and Mike Lee, who was a Maron finance officer. Benson overheard the conversation while she continued working. She did not actively listen to the whole conversation, but her ears perked up when she heard them discussing Kazemi and how much Maron would owe him under the existing shareholders' agreement. Benson did not recall the amount, but the size of Kazemi's buyout infuriated Eric. She heard Eric tell Schwartz: "There's no f***ing way that we are going to pay him that amount of money. You f***ed this up. You better f***ing fix it."

¶ 11    When Kazemi would not sign a new agreement, Maron began trying to read their existing contract as favorably to itself as it could. On October 2nd—more than a month after Kazemi left Maron—his attorney sent a demand letter to Maron stating that it was in breach of contract and owed Kazemi $6.4 million (Kazemi later sued for $6.2 million). Maron and the firm's accountants at FGMK then exchanged e-mails and phone calls about Kazemi's buyout and the incorporation of "contingent liabilities" totaling more than $3.9 million.

¶ 12    More specifically, on December 5th, Lee sent an e-mail to Eric, Schwartz, Maron's attorneys, and Mario J. Donato, who was the managing partner of FGMK, with the subject line "Contingent Liabilities @ 8/23/19." Lee attached a PDF entitled "Contingent Liabilities @ 001" and said that his attachment was "For our discussion today at 11:30." Schwartz sent an e-mail on December 9th to Lee and Donato, attaching a PDF regarding "Kazemi Contingent Liabilities" and said, "The total of the contingent liabilities is $3,947,000.00." Schwartz noted, "It is possible you will be asked to verify that these items are properly designated as such." On December 9th, Donato

e-mailed Schwartz, cc'd Lee and several FGMK personnel, and asked Schwartz for a copy of the shareholders' agreement "so they can read it and understand how the amounts are to be determined." Donato added, "I would recommend that we all either meet or have a conference call to brainstorm." Schwartz said in an e-mail to Eric, Lee, and Maron's attorneys on December 11th, that they had figured out how to reduce the value by "several million" and that FGMK was willing to testify in court. Schwartz also said that he wanted to have a conference call on December 12th and that FGMK would be joining the call. Donato e-mailed his partner Bill Polash, who specialized in disputed resolutions. On December 28th, Eric sent an e-mail to Lee about a stock transaction with a different employee and complained that it was the "[s]tupidest thing ** ever *** other than [letting] Kazemi buy stock for a fraction of what it cost." On January 23, 2020, Schwartz e-mailed Polash and attached "an adjusted worksheet [that Schwartz] prepared offering a suggested starting point for the valuation process."

¶ 13    Coincidentally, on the same day that the "brainstorming" session occurred, Kazemi's attorney e-mailed Maron's attorney to propose that the parties seek a valuation from Maron's historic accountants, and that, in the interest of transparency, they copy each other on all of their communications with the accounting firm. Kazemi and his lawyer had no idea that Maron and FGMK had already been discussing the valuation.

¶ 14    Schwartz testified that the only reason that he approached Kazemi with a new agreement in 2019 was because, embarrassingly, Schwartz had forgotten that an agreement was in place. The 2009 Menlo Agreement was named for the company that owned Maron when Kazemi became a shareholder. In 2014, the Menlo Agreement was incorporated into the "Maron Agreement" and the Menlo organization ceased to exist. Then the CFO forgot about the 2014 shareholders'

contract. This was Schwartz's belief in 2018 when he and Eric were discussing Schwartz's gradual retirement and a succession plan. Eric was frustrated by the lack of a shareholders' agreement, and Eric's assistant at the time, Benson, overheard some of what Eric said. At the time, Kazemi had no plans to leave. Later, when Schwartz and Eric shared their proposed shareholders' agreement with Kazemi, they had no idea that he was considering leaving the company. Schwartz testified that "brainstorming" with the accountants was not a "secretive method," it was a discussion or conversation in which "[e]verybody comes up with their ideas." Under the shareholders' agreement, he was permitted to "give [the accountants his] thoughts on how to *** interpret the agreement" and he had "the right to voice [his] opinion."

¶ 15     FGMK accountant William A. Polash signed a report in April 2020 indicating that although Maron's annual revenues were approximately $90 million, Kazemi's part ownership was worthless. Polash determined that (1) all of Maron's $11.2 million net worth was negated by the $15 million that the company would have to spend to complete its existing contracts and (2) none of the clients would pay their bills. Polash testified that he was the chair of FGMK's dispute consulting and valuation practice, 70% of his current work was to perform valuations, and he had been involved in approximately 50 lawsuits. He acknowledged that although FGMK had been Maron's accountant for approximately 30 years, he had never previously worked for Maron or communicated with its CFO. He first looked at the account when his partner Mario Donato gave him the project and said that Kazemi had already left the company. Polash was contractually engaged by Maron and he did not consider Kazemi to be his client. He had a phone conversation with Schwartz in which they went through specific parts of the shareholders' agreement and discussed having Maron's attorney speak with Polash about it. There was no attempt to include

Kazemi on the call. Polash also exchanged e-mails with Schwartz and Maron's attorneys. No one told Polash about the genesis of the agreement or that Maron's former president, Jerry, had put it together and wanted Kazemi to have the shares. Polash's calculations might have been different if Schwartz had said that the shareholders' agreement was intended to incentivize Kazemi to remain at Maron by offering an increasing payout over time. Generally, under a vesting schedule, the longer the employee stays, the better the payout. However, under this agreement, if Kazemi left in the first five years, he would receive his money back and in the subsequent years, he "might get wiped out." Polash called Schwartz to confirm that the intent of the agreement was to protect the company. Polash was engaged to make a calculation, not to determine if the agreement made sense.

¶ 16    Gary J. Levin testified that he became a CPA in 1982 and had recently retired as a partner at Deloitte. Prior to his retirement, he was leading Deloitte's litigation and dispute practice, initially for the United States and later for Deloitte's global practice, and he had experience as an expert and an arbitrator. He also had experience teaching and writing about accounting standards and the rules regulated by the American Institute of Certified Public Accountants (AICPA). Levin had considerable experience with "golden handcuffs" agreements, which he described as contracts that compensate a key employee for "past services" and the value that the person created.  Levin said in his report that "FGMK's $15.8 million downward adjustment to the value of the company's net worth in its calculation of value per share is inconsistent with both the Maron agreement and AICPA valuation standards." The agreement specified how to perform the calculation. Levin specifically disagreed with FGMK's determination that contingent liabilities were not subject to GAAP and with its disregard for the agreement's statement that "[n]o adjustment shall be made on account of any event occurring subsequent to the Valuation Date." Levin calculated Kazemi's

buyout to be $6,259,499. Levin started his calculations with the company's undisputed net worth of $11,251,000, multiplied that by Kazemi's 11.27% of the company's shares, and arrived at $633,994. Levin followed the exact wording of the shareholders' agreement. The agreement also required the calculation of a second figure, so Levin took 10% of the $11,251,000 net worth, multiplied by the number of years of service since 2014, which was five additional years, and calculated $5,625,505. The sum of $633,994 and $5,625,505 was $6,259,499.

¶ 17    Eric testified that he was not involved in drafting the shareholders' agreement and that his father created it shortly before he died. Because Schwartz's shares were fully retired, Eric and Kazemi were currently Maron's sole shareholders. Eric had nothing to do with identifying or preparing the contingent liabilities for the purposes of Kazemi's buyout. He did not engage in any brainstorming. He was not involved in any phone calls. He did not try to have anyone at Maron "influence FGMK to make adjustments or make any choices." The shareholders' agreement was a form of "golden handcuffs" or a financial incentive to keep a key employee. Eric was "happy" for Kazemi's "sweetheart deal," but he acknowledged sending an e-mail to the new CFO, Mike Lee, on December 28, 2020 stating that Kazemi's agreement was "the stupidest thing the company has ever done." Benson misunderstood the phone conversation that she overheard in 2018. Eric wanted a succession plan for when he and Kazemi were ready to retire. This was the origin of the new shareholders' agreement that Schwartz tried to get Kazemi to sign. Eric had entirely forgotten that the 2014 agreement was in place. Eric was "shocked" and "sad" when Kazemi resigned because Eric thought that the two of them were going to retire from Maron at the same time. Also, if Eric had known that Pore was unhappy enough to quit the company because of Luke Fenner's management, then Eric would have tried to improve the relationship and then considered letting

Fenner go. Pore was more important to Maron because he had "the accounts and the ability to, you know, make our way into the data center market."

¶ 18    Sheila A. Enriquez, a partner at the CPA and accounting firm Crowe, LLP, reviewed Polash and Levin's opinions. She agreed with Polash's method and disagreed with Levin's. Levin misread the shareholders' agreement to mean that the contingent liability adjustments had to be in accordance with GAAP. Levin's interpretation was incorrect because the agreement provided that the company's books had to be maintained in accordance with GAAP, then adjustments were to be made. Levin deemed FGMK's adjustments to be "nonsensical," but Enriquez considered them to be "reasonable under the circumstances." FGMK had been retained for a calculation engagement, meaning that its assignment was determined between the client and the analyst. It had not been retained for a valuation engagement in which it would have determined the fair market value of the company. This shareholders' agreement was "essentially a golden handcuff," incentivizing an executive to stay because "the longer he stays, the more that he would get." While working for another client recently, Enriquez had calculated a zero value because the shareholder was leaving before a particular period. The agreement encouraged the key employee to stay because it would cost the key employee to leave. Levin thought it was nonsensical that the estimated cost to complete projects was one of Polash's contingent liabilities, because that figure would vary depending on how many projects were in progress and could potentially be zero. Enriquez, however, thought that Polash's interpretation of the agreement was reasonable because if there were many projects underway, then the company was at greater risk when the key employee left. Polash's calculation was "neutral," "independent," and did not favor either party. Levin made two mistakes. The first of which was to exclude the $15 million contingent liability

that Polash calculated. The second of which was "nonsensical" and "grossly incorrect" because Levin, in effect, multiplied Kazemi's $150,000 stock purchase by 42 and determined that Kazemi was entitled to $6.3 million, which was a much greater figure than Kazemi's investment and was more than half the company's $11 million value. "It just [did] not make sense" that Kazemi could take that much of Maron's entire net worth.

¶ 19    Enriquez had a different methodology that did not require deducting any contingent liabilities. She calculated Kazemi's buyout by starting with the company's net worth on August 23, 2019, which was $11,251,000; she divided the net worth by the number of outstanding shares, which was 656.66, and she arrived at a value per share of $16,902. The shareholders' agreement used the term "value per share." Following the formula specified in the agreement, she then reduced the $16,902 value per share by 50%, which resulted in $8,451 per share. She also calculated 10% of the net worth, multiplied that figure by five years and arrived at $4,226. Next, she added $8,451 to $4,226, which netted $12,678 value per share. Then she multiplied $12,678 by the number of Kazemi's shares, which was 11.27% of the company or 75 shares when he resigned, and determined that Kazemi's buyout was $950,740. Her figure was $5,308,760 less than Levin had calculated.

¶ 20    Enriquez acknowledged that Maron's financial statements did not include reserves for uncompleted contracts. She also acknowledged that the shareholders' agreement did not increase Kazemi's compensation in any way and that if he left during the first five years of the agreement, his $150,000 purchase was simply refunded. Under her definition of net worth, however, the additional 10% in year six and every year after was ineffective and Kazemi would never receive more compensation than he would receive in the fifth year.

¶ 21    Jason Pore testified that he was a Maron project executive, and assisted with bidding and procuring work, ran construction sites, and oversaw other project managers. Pore started working in the industry in 2001 and joined Maron in 2012. Pore was promoted in 2017, but in early 2019, he told Fenner and Kazemi that he was considering leaving Maron because of the work environment that Fenner was creating. Fenner lacked "decorum and [sufficient] knowledge in the construction industry," had an "aggressive personality," and was "very overbearing and Type A." Pore did not have a new employer in mind, but was "leaving [Maron] one way or the other." In April 2019, he and Kazemi began negotiating their employment with Gurtz. Pore resigned on August 12th, right after the company's regular Monday morning meeting, by staying in the meeting room to give his resignation letter to Eric. Pore chose this timing because he was leaving to take his kids on vacation before they went back to school. Their conversation was sad, not contentious. Eric asked if there was anything that would change his mind and Pore said "no." Pore would have considered staying, however, if Fenner was let go. After their conversation, Eric began calling the other project managers into the conference room, one by one. Eric fired Fenner two days later. Pore was an at-will employee and did not have a noncompete agreement. Pore received a job offer from Kazemi on August 29th, which he accepted on August 31st. Kazemi had been saying for years that his buyout from Maron would be $1.3 to $1.4 million. Maron tried to get Kazemi to sign a new contract in the spring of 2019 that would have added noncompete and nonsolicitation terms. Maron's offer made Kazemi angry. Pore subsequently returned to his old job at Maron, with an increase in compensation.

¶ 22    Chris Farrington was the last trial witness. He testified that in 2019 he worked for Pepper Construction managing interior projects for downtown and suburban commercial office space. His

company won the bid to be the general contractor on a Goldman Sachs remodeling project for three floors at 71 South Wacker. Farrington sought subcontractors, including bids from six to eight electric subcontractors that Pepper Construction typically worked with. Gurtz Interiors was a new company, but Farrington had known Kazemi for 20 years and also knew Pore from his many years in the industry. Maron's bid was not competitive. Only the three lowest bidders, Gurtz Interiors, Titan Electric, and Terrance Electric, were invited to interview with Goldman Sachs. Goldman Sachs preferred Titan Electric, but selected Gurtz Interiors because its bid was the lowest. Pore was well liked and respected at Pepper Construction, but his role as the project manager was not a determinative factor because Goldman Sachs was the decision maker and ultimately chose based on price. Gurtz Interiors' bid was $2.6 million, Titan Electric's bid was about $200,000 higher, and Maron's bid was roughly $600,000 to $800,000 higher.

¶ 23    The jury found in favor of Kazemi on his breach of contract claim (Count I), and on January 17, 2025, the circuit court entered a judgment of $6,259,499 on the jury verdict. On February 5, 2025, the court resolved Kazemi's claims for breach of fiduciary duty against Eric (Count III), an accounting against both defendants (Count IV), and Maron's counterclaim against Kazemi for breach of fiduciary duty (Count I of the counterclaim). Regarding the claim against Eric, the court ruled that Eric "did act in a willful and wanton manner by setting in motion a series of events *** with the express intent of depriving [Kazemi] of an honest and fair repurchase price for his stock." The court determined that an award of "$1,500,000 in punitive damages against Eric Nixon to be appropriate, fair and consistent with the evidence in this case. Additionally, the Court awards [attorney] fees to the Plaintiff against Eric Nixon for this breach, and Plaintiff has leave to file a Petition by 2/19/25 itemizing such fees if he so chooses." As for the accounting claim, the court

ruled that it was mooted by the jury's award and that an accounting "could not render the Plaintiff any more whole than he has already been made in this case." With respect to Maron's counterclaim for breach of fiduciary duty, in which it claimed that "Kazemi, as an officer of Maron, unlawfully poached Jason Pore and unlawfully commenced competition with Maron while still an officer," the court found that Maron did not sustain its burden of proof. On May 6, 2025, the court denied the defendants' motion for a new trial and *remittitur*, defendants' motion to reconsider its judgment on the non-jury counts, and Eric's motion to modify the judgment (*remittitur*). That same day, the court also granted and denied in part Kazemi's petition for attorney fees and costs, and awarded $2,621,299.42 in attorney fees against Eric. This appeal followed.

¶ 24    Maron first argues that the circuit court erred in denying Maron's motion to dismiss or motion for summary judgment on Kazemi's amended Count I, breach of contract, because Kazemi could not prove that the shareholders' agreement was breached.

¶ 25    As a general rule, when the circuit court denies a defendant's motion to dismiss a complaint and the defendant then files an answer to the complaint, the defendant has waived any defect in the pleading. *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 60 (1994). Furthermore, when a defendant allows an action to proceed to verdict, the verdict cures "not only all formal and purely technical defects and clerical errors in a complaint," but it also cures "any defect in failing to allege or in alleging defectively or imperfectly any substantial facts which are essential to a right of action." *Id*. at 60-61 (cleaned up). This is known as the doctrine of aider by verdict. *Id*. at 60. Another general rule is the merger doctrine, which provides that the denial of summary judgment is not reviewable after a jury trial because the order merges with the judgment. *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶ 42. The merger doctrine exists because a

"subsequent verdict is necessarily based on a more complete presentation of the evidence than was the motion for summary judgment." *Davis v. International Harvester Co.*, 167 Ill. App. 3d 814, 819 (1988). All of these principles are applicable here.

¶ 26    The circuit court denied Maron's motion to dismiss, then Maron filed an amended answer to Kazemi's amended complaint. By answering, Maron waived its ability to complain about the alleged insufficiency of the amended complaint. *Adcock*, 164 Ill 2d at 62.

¶ 27    Next, the entry of judgment after the jury trial triggered the doctrine of aider by verdict that precludes Maron's challenge to any factual or technical defects in the amended complaint. *Id*. at 61.

¶ 28    And finally, as the merger doctrine recognizes, it makes little sense to now quibble over whether Kazemi had sufficient evidence to create a genuine issue of material fact in opposition to the motion for summary judgment when he has since proven his case by a preponderance of the evidence. Arguing that Kazemi was not going to be able to prove breach of contract, when he has proven breach of contract, is pointless. An exception to the merger doctrine is made when the issue raised in the summary judgment motion presents a question of law that would not be decided by the jury. *Young*, 2015 IL App (1st) 131887, ¶ 42; *Moy v. Ng*, 371 Ill. App. 3d 957, 959 (2007). In that circumstance, the denial of summary judgment does not merge with the judgment and may be reviewed *de novo*. *Id.* Maron tries to bring the issue within this exception, by incorrectly stating that Kazemi's breach claim was grounded on (1) an accountant's error, for which Maron cannot be liable and (2) fraud, which is subject to heightened standards of pleading and proof that Kazemi did not attempt to meet. Kazemi, however, did not sue over FGMK's error or fraud. He claimed that Maron had an express contractual obligation to "direct its regularly employed accountants to

perform the calculations necessary to determine the Value Per Share;" that the accountants' assignment was supposed to be performed "independent[ly];" and that rather than permitting FGMK to form its own conclusions, Maron interfered in the process. Kazemi claimed that this conduct was in breach of the shareholders' agreement and in breach of the duty of good faith and fair dealing that was inherent in Maron's task. *Diamond v. United Food & Commercial Workers Union Local 881*, 329 Ill. App. 3d 519, 526 (2002) (a duty of good faith and fair dealing is implicit in every contract as a matter of law); *Schwinder v. Austin Bank of Chicago*, 348 Ill. App. 3d 461, 473-74 (the implied promise of good faith and fair dealing between the parties emphasizes faithfulness to an agreed common purpose and the justified expectations of the other party). Maron's mischaracterization of the factual basis for the suit does not persuade us to review whether it was entitled to summary judgment. The denial of Maron's motion for summary judgment has merged into the judgment that was entered after the jury trial and it is not reviewable. *Young*, 2015 IL App (1st) 131887, ¶ 42; *Davis*, 167 Ill. App. 3d at 819 (1988); *Moy*, 371 Ill. App. 3d at 959.

¶ 29    Maron contends it was denied a fair trial because the circuit court committed numerous errors during the proceedings.

¶ 30    The first claimed trial error was using Kazemi's tendered jury instructions Numbers 8 and 9 when they did not accurately convey the law. These instructions concerned the duty of good faith and fair dealing in the performance of a contract. Number 8 instructed the jury that there is an "obligation which is implied in the law that both parties will perform their respective duties *** in good faith" and "will refrain from doing anything which will have the effect of *** destroying the right of the other party to receive the fruits or benefits of the contract." Number 9 stated that "[a] breach of the covenant of good faith and fair dealing is a breach of the contract."

¶ 31     Maron contends that the instructions or verdict forms should have required the jury to "find that Maron had contractual discretion or that such discretion was exercised inappropriately or capriciously." Maron contends that when the jury was not asked to make a finding about Maron's discretion, the jury was being told there had been a *per se* breach of contract. "[E]very party has the right to have the law applicable to his case stated fairly, clearly, distinctly and conveyed to the jury with substantial accuracy so that it may not be misled to the prejudice of the party." *Sims v. Chicago Transit Authority*, 7 Ill. App. 2d 21, 29-30 (1955). Maron is posing a question of law that is addressed *de novo*. *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 13. "A reviewing court ordinarily will not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant." *Schultz v. Northeast Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 274 (2002).

¶ 32     Maron cites a portion of the jury instruction conference in which it purportedly objected to Numbers 8 and 9, but that passage does not indicate that Maron raised its specific current objection, tendered alternative instructions to correct the alleged error and tendered an alternative verdict form. Maron tries to sidestep its inaction by arguing that "there was no possible cure for the improper instructions since the contract did not vest Maron with any discretion." Maron, however, could have tendered an instruction and verdict forms which indicated that discretion was necessary. Accordingly, we find that Maron has forfeited its new argument about instructions Numbers 8 and 9 and the contents of the verdict forms. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (the brief "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on" or the argument is forfeited); *K&K Iron Works, Inc. v. Marc Realty, LLC*, 2014 IL App (1st) 133688, ¶ 25 (argument that has not been

raised in the circuit court is forfeited and may not be raised for the first time on appeal); *Compton v. Ubilluz,* 353 Ill. App. 3d 863, 869 (litigant forfeits appellate argument about given instructions or verdict forms when litigant has not made specific objection during jury instruction conference; and even when litigant properly objects to an instruction or verdict form, the litigant must also submit a remedial instruction then or verdict form to the circuit court); *Deal v. Byford*, 127 Ill. 2d 192, 203 (1989) (same).

¶ 33    Maron next contends it was error to determine that the contract was ambiguous, which permitted the use of parol evidence. Kazemi argued that the terms "Net Worth" and "contingent liabilities" were ambiguous. Maron countered that their meaning was clear, but that "Net Worth" had two different meanings within the agreement. Maron contends that during oral argument on Maron and Eric's motion *in limine* to bar parol evidence, the circuit court not only erroneously deemed the terms to be ambiguous, but also erred by finding ambiguity in the additional term "Reserves" in the phrase "Reserves for contingent liabilities" and ambiguity as to "whether the adjustment for reserves [for] contingent liabilities was to be performed in conformance with GAAP." Whether contract language is ambiguous and requires extrinsic evidence for interpretation is a question of law that is reviewed *de novo. Installco, Inc. v. Whiting Corp.*, 336 Ill. App. 3d 776, 783 (2002). The circuit court should examine the instrument as a whole before considering any extrinsic evidence. *Id.* A contract is not ambiguous simply because the parties disagree about its meaning. *Id.* It is ambiguous when its terms can reasonably be interpreted in more than one way. *Id.*

¶ 34    Maron's own brief illustrates the ambiguity as to "Net Worth." Maron contends that the term was used twice in the same paragraph to mean "*two different things.*" Maron devotes a full

page of its brief to explaining the two different meanings and then concludes "there is no ambiguity here because the separate meanings [are] plain." According to Maron, the first instance of "Net Worth" describes Kazemi's vesting schedule whereby after five years of tenure he would be entitled to only 50% of the Value Per Share, but then he would start to accumulate an additional 10% of 50% of the Value Per Share (*i.e.*, 5%), so that by year 16, he would finally be fully vested and entitled to 100% of the Value Per Share. Then the second instance of "Net Worth" appears in the sentence that defines the term as "an amount equal to the amount of the Company's assets, less the amount of its liabilities as disclosed by the Company's books of account regularly maintained in accordance with [GAAP] consistently applied but adjusted" for "Reserves for contingent liabilities." As the circuit court observed, the terms "Net Worth" and "contingent liabilities" do not have definitive and universal meanings apparent on their face" and "Just the fact that we're spending this amount of time talking about [there being ambiguities] is indicative [that there are ambiguities]." When the court subsequently ruled on Maron's motion for a new trial, the court commented that the ambiguity in "Net Worth" and "contingent liabilities" had been confirmed by the "differing interpretations of those terms provided by the respective accounting experts." The fact that one of the most crucial material terms in the agreement is subject to two entirely different meanings constitutes an ambiguity. When contract language is ambiguous, its meaning becomes a question of fact and extrinsic evidence is admissible to determine what the parties intended. *Installco*, 336 Ill. App. 3d at 783. The parties' accounting experts calculated the value of Kazemi's shares based on the competing definitions and testified about their methodology. Kazemi used cross-examination to demonstrate mathematically that Maron's definition of "Net Worth" could not be correct and the jury agreed with Kazemi's definition. The record does not substantiate

Maron's contention that "Net Worth" was unambiguous and did not warrant the admission of parol evidence so that the jury could resolve its meaning.

¶ 35    We also reject Maron's concern that the court remarked that ambiguity pervaded the contract ("There are ambiguities all over the place."), including the meaning of "Reserves for contingent liabilities" and "whether the adjustment for reserves to contingent liabilities was to be performed in accordance with GAAP." Maron is arguing a red herring. Kazemi did not argue that "Reserves for contingent liabilities" was ambiguous. Furthermore, he did not argue that the contingent liabilities were supposed to be calculated according to GAAP. Rather, Kazemi's argument was that regardless of whether GAAP was used, Maron breached the shareholders' agreement by reducing the value of his shares to nothing. For instance, he presented evidence that it was absurd to apply every conceivable liability, such as the assumption that Maron would incur all the expenses on every pending client contract and would complete all of the contracted work, despite never receiving any client payments. The issue was not whether these contingent liabilities conformed with GAAP. The issue was whether encouraging the accountants to adopt an absurd view of "contingent liabilities"—liabilities for which there were no "reserves" on Maron's books—was more than "direct[ing]" the accountants to calculate Kazemi's buyout.

¶ 36    Another claimed trial error is that the circuit court refused to submit jury instructions for the affirmative defenses of "waiver," "estoppel" and "express terms defeat contract" which would have overcome Kazemi's breach of contract claim. Maron cites six pages of jury instructions in the record on appeal, but the instructions are not marked as having been agreed to, objected to, allowed, or disallowed. Nevertheless, the trial transcript indicates that Maron argued for these instructions, Kazemi countered that Maron was mislabeling its defense as *affirmative* defenses,

and the circuit court rejected the concepts as not relevant to the evidence before the jury. Whether to provide a particular jury instruction is within the circuit court's sound discretion and its decision will be reversed only for an abuse of discretion. *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 203 (2006). There is no abuse of discretion when " 'taken as a whole, the instructions fairly, fully, and comprehensively apprised the jury of the relevant legal principles.' " *Id.* (quoting *Schultz*, 201 Ill. 2d at 273-74).

¶ 37    We agree with Kazemi that Maron has been using incorrect terminology and that its defenses of "waiver," "estoppel" and "express terms" were not affirmative defenses. " 'An affirmative defense is one that admits the allegations in the complaint, but avoids liability, in whole or in part, by new allegations of excuse, justification or other negating matters.' " *Reed v. Columbia St. Mary's Hospital*, 915 F.3d 473, 477 n.1 (7th Cir. 2019) (quoting *Divine v. Volunteers of America of Illinois*, 319 F. Supp. 3d 994, 1003 (N.D. Ill. 2018)). In other words, an affirmative defense admits the factual allegations of the complaint but adds some other reason why the defendant is not liable. *Vroegh v. J&M Forklift*, 165 Ill. 2d 523, 530 (1995) (an affirmative defense "assumes that the defendant would otherwise be liable, if the facts alleged are true, but asserts new matter by which the plaintiff's apparent right to recovery is defeated"); *Instituto Nacional De Comercializacion (Indeca) v. Continental Illinois National Bank & Trust Co.*, 575 F. Supp. 985, 991 (N.D. Ill. 1983) (quoting 2A *Moore's Federal Practice* ¶ 8.27 [4], at 8-260) (" 'a true affirmative defense raises matters outside the scope of plaintiff's *prima facie* case and such matter is not raised by a negative defense' "). In contrast, a negative defense denies a plaintiff's allegations and "is the equivalent of a defendant saying, 'I did not do it.' " *Federal Trade Comm'n v. Think All Publishing, L.L.C.*, 564 F. Supp. 2d 663, 665-66 (E.D. Tex. 2008). The "mere denial of an

element of a cause of action, without asserting any new matter, does not constitute an affirmative defense." *Rohr Burg Motors, Inc. v. Kulbarsh*, 2014 IL App (1st) 131664, ¶ 63.

¶ 38 Waiver is either an express or implied voluntary and intentional relinquishment of a known and existing right. *Wells v. Minor*, 219 Ill. App. 3d 32, 45 (1991). Maron's proposed "waiver" instruction was: "the plain terms of the [shareholders' agreement] provided that the Value Per Share is to be determined by [Maron's] regularly employed accountants, which calculation shall be binding on the parties" and Kazemi "demanded that [Maron] have its accountants perform the calculation pursuant to the [shareholders' agreement]." Maron did not identify any right that Kazemi relinquished when he demanded that Maron ask FGMK to perform the accounting task. Maron did not introduce any new matter. It was not stating an affirmative defense of waiver.

¶ 39 "Estoppel arises when a party, by his word or conduct, intentionally or through culpable negligence, induces reasonable reliance by another on his representations and thus leads the other, as a result of that reliance, to change his position, to his injury." *Byron Community Unit School No. 226 v. Dunham-Bush, Inc.*, 215 Ill. App. 3d 343, 348 (1991). Maron's proposed "estoppel" instruction was that Maron "relied on [Kazemi's] demand to have FGMK perform the calculation." Maron did not specify any way in which Maron changed its position and suffered an injury. Maron failed to state an affirmative defense of estoppel.

¶ 40 Maron's proposed "express terms defeat contract" instruction was: "The [shareholders' agreement] requires that [Maron] use its regularly employed accountants to calculate the Value Per Share and that such calculation shall be binding and conclusive on the parties. [Maron] maintains that [its] adherence to the terms of the [shareholders' agreement] cannot be a breach of the contract." In other words, defendant Maron was professing, "I did not do it." This was the

epitome of a negative defense rather than an affirmative defense. *Federal Trade Comm'n*, 564 F. Supp. 2d at 665-66 ("a negative defense is the equivalent of a defendant saying, 'I did not do it.' ")

¶ 41     Maron essentially argued to the jury that it complied with Kazemi's demand pursuant to the shareholders' agreement to have FGMK perform the buyout calculation, was contractually permitted to communicate directly with FGMK, and accepted FGMK's results as "binding and conclusive" pursuant to the agreement. This was an argument that Maron performed the contract as required—that Maron did not breach—rather than an admission that it did breach but had an excuse or justification for why it failed to perform its duties. Maron's defense did not include an affirmative defense. It was denying an essential element of Kazemi's claim, the breach element, and the jury rejected the defense. See *Rohr Burg Motors*, 2014 IL App (1st) 131664, ¶ 64 ("the statement that Kulbarsh returned the vehicle after receiving payment simply denies Rohr Burg's allegation that Kulbarsh remained in possession of the vehicle after receiving the funds due to him under the General Release. *** [T]his does not constitute a separate affirmative defense[.]").

¶ 42     Furthermore, Maron has not stated how it was prejudiced by the circuit court's refusal to give these three (irrelevant) instructions and to instead instruct the jury consistent with the parties' evidence. See *Marsh*, 2020 IL App (4th) 190314, ¶ 36 (giving faulty instructions does not warrant reversal unless the instructions clearly misled the jury and prejudiced the appellant). The circuit court remarked in its judgment order on the bench/nonjury claims, "The greater substance of the affirmative defenses were argued to the jury by the Defendant in seeking a finding of no liability on Count I, and further in seeking a judgment against Plaintiff on tortious interference." The record shows that Maron also argued in closing that it did not breach the shareholders' agreement. Despite

Maron's vigorous denials that it breached, the circuit court noted that "[t]he jury quite clearly and quite roundly rejected these defenses and arguments, as does this Court." Maron put on a negative defense that did not include evidence that would warrant giving instructions for the so-called affirmative defenses of waiver, estoppel and compliance with the contract's express terms. A party has a right to have the jury instructed on his theory of a case provided there is a sufficient evidentiary basis for that instruction, but it is reversible error to instruct the jury on a principle that is not supported by the evidence. *Falkenthal v. Public Building Comm'n of Chicago*, 111 Ill. App. 3d 703, 709 (1982). Accordingly, we do not find that the circuit court abused its discretion by rejecting those particular instructions. *Studt*, 2011 IL 108182, ¶ 13.

¶ 43 The fourth alleged trial error occurred when the circuit court granted Kazemi's motion for a directed finding as to Maron's affirmative defense that Kazemi committed a prior material breach of the shareholders' agreement when he solicited another Maron employee, Pore, to also leave Maron. Maron contended that this first breach precluded Kazemi from suing for breach of the shareholders' agreement. The hearing transcript discloses that Kazemi opposed the affirmative defense by arguing that he was an at-will employee without a written contract that prohibited his speech. As the proceedings continued, Maron acknowledged that there was no written employment contract. The circuit court responded, "[Y]ou're asking me to say that there was an oral contract and some implicit agreement not to look for another job or [if you did look for other employment] not to *** see if others were maybe interested in the same job." The court also said that there had to be a "specific contractual provision preventing that happening," otherwise anyone that was "employed by somebody else then can be subject to a breach of contract [claim] for simply asking someone if they want to come work for another company." The circuit court rejected Maron's prior

breach theory as not being relevant to the breach of contract claim that was before the jury. Maron contends that the ruling was in error and warrants a new trial.

¶ 44    This is another argument that is forfeited because it is insufficiently briefed. Maron does not cite authority addressing the affirmative defense of prior breach of a contract. In fact, Maron does not cite any authority at all. Supreme Court Rule 341(h)(7) is the briefing rule that prevents an appellant from depriving the appellee of an opportunity to respond to the appellant's argument in writing. Ill. S. Ct. R. Rule 341(h)(7) (eff. Oct. 1, 2020) (appellant must cite authority or forfeit the contention on appeal); *Fortech, L.L.C. v. R.W. Dunteman Co., Inc.*, 366 Ill. App. 3d 804, 818 (2006) (a party's failure to cite relevant authority violates Rule 341 and can cause the party to forfeit consideration of the issue); *Eberhardt v. Village of Tinley Park*, 2024 IL App (1st) 230139, ¶ 25 (same). We will not create an argument on Maron's behalf as to whether its affirmative defense of prior breach should have been presented to the jury.

¶ 45    Maron next argues that the circuit court should have granted a new trial after erroneously admitting testimony about Maron's "profits," "revenues" and potential sale "value" that was "not relevant," was "confus[ing]," and "seriously prejudiced" Maron by "impassion[ing] the jury to believe that Maron has enormous assets." Maron contends that testimony about its financial ability to pay Kazemi was not relevant and should not have been allowed. Kazemi responds that Maron forfeited this argument by failing to make contemporaneous objections in the circuit court.

¶ 46    According to Kazemi, Maron made only fleeting objections on the grounds of speculation or form and did not ask for limiting instructions. See *First National Bank of LaGrange v. Lowrey*, 375 Ill. App. 3d 181, 211 (2007) (where defendant's failure to make contemporaneous objection resulted in forfeiture of the issue on appeal). We need not confirm whether Maron made an

adequate objection in the trial court, because, as Kazemi also points out, "Notably, in its one-paragraph argument, Maron makes no effort to explain how any of the testimony it cites was either irrelevant, inflammatory, or prejudicial." The briefing rule we cited above, Rule 341 (Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020)), obligates the appellant to present reasoned argument rather than bare contentions and an appellant should not expect this court to fill in the gap. Furthermore, Maron has failed to cite and discuss authority which substantiates its argument that this evidence was not relevant and only served to "confuse and impassion the jury." Maron cites—but does not bother to discuss—precedent in which a surgeon was permitted to testify over objection that his father was a minister, which was deemed an irrelevant and inadmissible fact in a medical malpractice action involving a patient's alleged lack of informed consent to surgery. *Downey v. Dunnington*, 384 Ill. App. 3d 350, 387 (2008). The case is, at best, tangentially relevant to Maron's argument and surely there was at least one case in which irrelevant financial information was admitted over objection. It is not our role to research and argue for an appellant. Maron has forfeited its argument by failing to adequately support it with argument and with relevant authority *Gakuba v. Kurtz*, 2015 IL App (2d) 140252, ¶ 19 (quoting *Skidis v. Industrial Comm'n,* 309 Ill. App. 3d 720, 724 (" '[T]his court will not become the advocate for, as well as the judge of, points an appellant seeks to raise.' ")).

¶ 47    Maron's sixth and last trial error is that the circuit court struck a potential juror for having general knowledge about accounting principles because the person had worked in finance, even though he affirmed that he "would rely on what that evidence and testimony is and judge the credibility of that, and not bring in [his] own experiences."

¶ 48    "Impartiality is a state of mind." *People v. Cole,* 54 Ill.2d 401, 413 (1973).

"A person is not competent to sit as a juror if his state of mind is such that with him as a juror a party will not receive a fair and impartial trial. [Citation.] The determination of impartiality is not purely objective. The trial court may consider a juror's statements as evidence of his state of mind. [Citation.] The determination of whether a prospective juror is capable of giving the parties a fair and impartial trial rests in the sound discretion of the trial judge, whose determination should not be set aside unless it is against the manifest weight of the evidence. [Citation.]" *Magna Trust Co. v. Illinois Central R. Co.*, 313 Ill. App. 3d 375, 390 (2000).

¶ 49    The trial transcript includes the following passage:

"MR. SWEENEY [(plaintiff's attorney)]: I think he did a fine job of keeping himself afloat for most of it. It was until we got to the reserve issue.

THE COURT: I agree. I think he's way too close to the situation, certainly a knowledgeable [person]. I would have to dismiss him. I think he would overrun the jury here, so [he] is going to be dismissed.

MR. SPARKS [(defense attorney)]: Judge, just for the record, I object on that. I think that he's—what is described there is fair and that he would be able to do it without prejudice.

THE COURT: Understood. Sometimes I have to look past that and check the tenor of their answers. And I just think that's too close to the situation at hand."

¶ 50    Thus, the record indicates that the trial judge struck the potential juror for two reasons. The first reason was that the circuit court "[had] to look past that [assurance of impartiality] and check the tenor of [his] answers" and the second reason was that the person's accounting expertise and

experience in the ultimate issues in this case put him "too close to the situation at hand" and would cause him to "overrun the jury."

¶ 51 This potential juror's *voir dire* examination shows that the circuit court did not abuse its discretion by excusing this person for cause. The person was trained and worked in the field of finance and accounting and had considerable experience with issues that directly related to the issues in this case. As an actuary, he was familiar with GAAP, did "mostly liability valuation" and "some financial valuation work," and was also "valuat[ing] reserves." The potential juror expressed his impartiality about certain topics, but when asked about his impartiality on what constituted a reserve, he answered that it would be "difficult" to remove what he knew about the topic from his work experience. He was not rehabilitated on that point. A trial judge is in a superior position to evaluate the meaning that a potential juror intends to convey when there are inconsistencies in that person's responses. *People v. Taylor*, 166 Ill. 2d 414, 422 (1995). The circuit court considered this person's testimony and demeanor and determined that he should be dismissed. The record does not suggest that the decision was contrary to the manifest weight of the evidence. *Magna Trust*, 313 Ill. App. 3d at 390.

¶ 52 Maron's third main argument on appeal is that the jury's verdict was against the manifest weight of the evidence. The entire argument consists of three sentences:

"A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence. *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992). For all of the reasons stated above, the jury's verdict is against the manifest weight of the evidence. (*See* §§ V, VI(A)(1)(a)-(b), *supra*.) These errors, alone or in combination, resulted in an

unreasonable and arbitrary verdict, which is not supported by relevant evidence."

¶ 53    Maron is citing Section V of its brief, which is its complete Statement of Facts, and Sections VI(A)(1)(a)-(b) of its brief, which contain its challenges to the denial of the motion for summary judgment (which was not reviewable on appeal) and motion to dismiss (which Maron waived by filing an answer). Maron is disregarding its obligations as an advocate for its theories of reversal. It is proposing that we review the amended complaint, the arguments for summary judgment, and all the evidence that was presented to the jury during the week-long trial. However, it is not our responsibility to search through the record on Maron's behalf. And, as we stated above, it is not our responsibility to craft arguments and gather the relevant authority. Maron has again violated Rule 341, which governs the contents of appellate briefs and required Maron to present its theories of reversal, supporting reasoned argument, citation to supporting authority, and citation to the relevant pages of the record. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (the opening brief "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on" or the argument is forfeited); *K&K Iron Works*, 2014 IL App (1st) 133688, ¶ 25 (argument that has not been raised in the circuit court is forfeited and may not be raised for the first time on appeal). Arguments that violate Rule 341 do not merit consideration and can be rejected solely for that reason. *Maun v. Department of Professional Regulation,* 299 Ill. App. 3d 388, 399 (1998). This argument is forfeited due to lack of citation to the record, argument, and citation and discussion of pertinent authority.

¶ 54    In the alternative, Maron's fourth main argument is that the circuit court erred by failing to grant *remittitur* of the jury's $6.3 million award on the breach of contract count, when the award lacked a factual basis in the record. Maron contends that the only basis for that figure is the

testimony of Kazemi's accounting expert, Levin, who disregarded Kazemi and Schwartz's personal calculations in 2019 that Kazemi's shares were worth $1.4 million. According to Maron, if Schwartz and Kazemi estimated the same amount when Kazemi quit in 2019 and Kazemi sued for the much higher figure in 2020 (after speaking with an accountant and a lawyer), then (1) there was no meeting of the minds when the contract was executed in 2009, (2) there was no enforceable contract, and (3) Kazemi's remedy is the $150,000 that he paid for the shares. Alternatively, the actual value was calculated to be $950,470 by Maron's accounting expert, Enriquez, when she corrected Polash's errors and properly applied Maron's "[r]eserves for contingent liabilities."

¶ 55   We review the ruling on a motion for *remittitur* under the abuse of discretion standard. *Binkowski v. International Health Systems, Inc.*, 2024 IL App (1st) 221557, ¶ 95. We will find an abuse of discretion only if the ruling was arbitrary or ignored recognized principles of law, or if no reasonable person would take the circuit court's position. *Id*. Despite Maron's contention that the jury's award exceeded the proven damages, Levin's testimony was competent and credible evidence that supported the jury's figure. *Remittitur* is appropriate only when a jury's award "exceeds the necessarily flexible limits of fair and reasonable compensation or is so large that it shocks the judicial conscience" or is "so excessive that it indicates that the jury was moved by passion or prejudice." *Binkowski*, 2024 IL App (1st) 221557, ¶ 96. A reviewing court gives great deference to a jury's award of damages. *Id*. Where the jury's verdict falls within the flexible range of conclusions reasonably supported by the evidence, *remittitur* should not be granted. *Id*.

¶ 56   Levin gave factual reasons for his opinion that Kazemi's direct damages were $6.3 million. Levin is a professional accountant who utilized the standards of the American Institute of Certified Public Accountants. He testified that the calculation methodology he used "comes actually from

the agreement itself" and represented "the exact wording from the agreement." He applied the express formula that called for "fifty percent of the computation of the Value Per Share *** plus ten percent (10%) of the Net Worth multiplied by [Kazemi's years of service since 2014]." He also analyzed the flaws in Maron's "contingent liabilities" adjustment. Thus, there was a rational connection between the evidence that was presented and the damages that were awarded.

¶ 57    Maron contends that Levin's calculation was wrong because he did not correctly adjust for reserves for contingent liabilities. However, a pillar of Kazemi's case was that in order for a reserve for a contingent liability to be included in the calculation, there actually had to be a reserve in the company's regularly maintained accounts. The evidence showed that Maron did not have reserves for all of the figures that Maron's accounting experts Polash and Enriquez were willing to deduct when calculating Kazemi's buyout. The jury was entitled to credit Levin's analysis and adopt his expert opinion over the other opinions that were given. As the finder of fact, the jury "listen[ed] to the competing expert testimony, weigh[ed] the evidence presented, determine[d] the credibility of all the witnesses, and determine[d] whose testimony to accept or reject." *Bosco v. Janowitz*, 388 Ill. App. 3d 450, 462 (2009); *Lisowski v. MacNeal Memorial Hospital Ass'n*, 381 Ill. App. 3d 275, 282 (2008) (same); *Binkowski*, 2024 IL App (1st) 221557, ¶ 78 (the jury is qualified to resolve conflicting expert testimony). The record does not substantiate that Maron was entitled to *remittitur*.

¶ 58    After the jury trial, the remaining equitable claims that were directed at Eric and Kazemi were addressed at a bench trial. Eric contends that the circuit court should have granted summary judgment against Kazemi's Count II, breach of fiduciary duty, because he neither owed nor breached fiduciary duties to Kazemi. As discussed above, the denial of summary judgment is not

reviewable after an evidentiary trial, as any error in the denial merges into the subsequent trial. *Young*, 2015 IL App (1st) 131887, ¶ 42; *Davis*, 167 Ill. App. 3d at 819 (1988); *Moy*, 371 Ill. App. 3d at 959. Nevertheless, we may review Eric's contentions in the context of the judgment that was entered against him, which he contends was contrary to the manifest weight of the evidence. "A judgment is against the manifest weight of the evidence only if the opposite conclusion is apparent or when findings appear to be arbitrary, unreasonable, or not based on the evidence." *Moy*, 371 Ill. App. 3d at 959.

¶ 59    Eric has a multitude of arguments. He contends that he and Kazemi were parties to a contract (Eric does not specify which contract) and that contracting parties do not stand in a fiduciary relationship to each other. See *Colmar, Ltd. v. Fremantlemedia North America, Inc.*, 344 Ill. App. 3d 977, 994 (2003) ("It is well-established that parties to a contract do not stand in a fiduciary relationship to one another."). Furthermore, "[n]ormal trust between friends or businesses, plus a slightly dominant business position, do not operate to turn a formal, contractual relationship into a confidential or fiduciary relationship." *Carey Electric Contracting, Inc. v. First National Bank of Elgin*, 74 Ill. App. 3d 233, 238 (1979). We reject this argument outright because Kazemi's claim against Eric was not based on a contractual relationship. Eric argues that while "directors or officers of a corporation occupy a confidential or fiduciary relationship to the corporation and its shareholders," "the duties and obligations incident to this relationship are owed to the corporation and not to the shareholders individually." *Poliquin v. Sapp*, 72 Ill. App. 3d 477, 482 (1979). In a variation of the "express terms" argument that we introduced above, Eric next contends that as Maron's CEO, he did not owe a fiduciary duty to Kazemi to reject FGMK's valuation, as it was contractually "binding" on the parties; he could not have breached the

shareholders' agreement by following its terms; and he actually would have breached his fiduciary duties to Maron if he had caused the company to reject the report. He states that Kazemi's injury was caused by his own rejection of the FGMK report, although Eric does not explain how rejecting a $0 valuation harmed Kazemi. Eric also contends he could not have caused any damages to Kazemi, because it was FGMK that calculated the share price and any mistake that FGMK made cannot be attributed to Maron or Eric. See *Herlehy v. Marie V. Bistersky Trust Dated May 5, 1989*, 407 Ill. App. 3d 878, 897 (2010) (to state a cause of action for breach of a fiduciary duty, a plaintiff must show that the breach is a proximate cause of the damage). Additionally, Eric contends that Kazemi's breach of contract claim prevented him from obtaining a "duplicate recovery" against Nixon for breach of fiduciary duty based on the same set of facts. This is another argument that we reject outright because Eric does not explain what the single set of facts was. His lack of argument results in forfeiture. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (arguments not raised in the opening brief are considered forfeited and may not be raised in a reply brief, at oral arguments, or in a petition for rehearing); *Robinson v. City of Chicago*, 2025 IL App (1st) 232174, ¶ 39.

¶ 60    The contention that Eric did not owe Kazemi fiduciary duties is incorrect for two reasons: Eric was Maron's controlling shareholder with 88.73% of the outstanding shares and Eric was the president and CEO with ultimate control over the company. Individuals who control corporations owe a fiduciary duty to the corporation and the shareholders. *Anest v. Audino*, 332 Ill. App. 3d 468, 476 (2002); *ICD Publications, Inc. v. Gittlitz*, 2014 IL App (1st) 133277, ¶ 66 ("Gittlitz, as president and shareholder of ICD, undoubtedly owed fiduciary duties to his fellow shareholders, Evans and Palcek.").

¶ 61    Eric counters that it was error to find that Maron was a close corporation and therefore its

majority shareholder owed fiduciary duties to its minority shareholder despite Maron never formally electing close corporation status under Article 2A of the Business Corporation Act of 1983. 805 ILCS 5/2A (West 2018) (Act). According to the definitions section of the Act, "a 'close corporation' means a corporation organized under or electing to be subject to Article 2A of this Act." 805 ILCS 5/1.8(s) (West 2018). Eric points out that there is no documentary evidence indicating that Maron is a close corporation.

¶ 62     This argument is unpersuasive for multiple reasons. First, the definitions section to which Eric refers was defining terms for purposes of the Act, but the Act was not at issue in this litigation and its definitions were not controlling. See 805 ILCS 5/1.8 (West 2918) ("As used in this Act, unless the context otherwise requires, the words and phrases defined in this Section shall have the meanings set forth herein."). Second, the term "close corporation" is commonly understood to mean "a corporation whose stock is not freely traded and is held by only a few shareholders (often within the same family)." *Corporation*, Black's Law Dictionary (12th ed. 2024)). Illinois courts have used the term in this way regardless of statutory election. See *Galler v. Galler*, 32 Ill. 2d 16, 17 (1964) (indicating that a close corporation is one in which the stock is not or only rarely bought or sold and is held "in a few hands, or in a few families," and that the organization before the court which was owned by two siblings and their spouses was a close corporation); *Hagshenas v. Gaylord*, 199 Ill. App. 3d 60, 62 (1990) ("Bruce, as a 50% shareholder in this closely held corporation, owed a fiduciary duty similar to a partner to Imperial and its shareholders"). Third, Eric is ignoring settled law and the trial evidence. Illinois courts have consistently held that fiduciary duties arise in closely held corporations regardless of statutory election, because the nature of the relationship is like a partnership. *Levy v. Markal Sales Corp.*, 268 Ill. App. 3d 355,

364-65 (1994) (three shareholders who owned 40%, 40%, and 20% of the corporation owed fiduciary duties and had mutual obligations that were similar to those of partners); *Hagshenas*, 199 Ill. App. 3d at 71; *Illinois Rockford Corp. v. Kulp*, 41 Ill.2d 215, 222 (1968) (50% shareholders of a company owed fiduciary duties to each other similar to that of partners). Thus, the Maron organization qualified as a close corporation under the commonly understood definition that has been used in precedent and by this trial judge, and, Eric, as the person who controlled this close corporation, owed fiduciary duties to Kazemi, as a shareholder.

¶ 63    Eric argues that the undisputed trial evidence showed, however, that there were three, not two, shareholders when Kazemi resigned, including Eric, Kazemi, and CFO Schwartz, whose tenure with the company dated to when Jerry ran Maron. Kazemi acknowledges that the evidence was conflicting as to how many shareholders there were in 2019, because the shareholders' agreement that Schwartz tried to get Kazemi to sign at that point indicated that only Eric and Kazemi were shareholders. The distinction that Eric is trying to draw is irrelevant because even if there were three shareholders, Eric's role as Maron's president and CEO meant that he controlled the close corporation and owed Kazemi fiduciary duties. *Anest*, 332 Ill. App. 3d at 476; *ICD Publications*, 2014 IL App (1st) 133277, ¶ 66.

¶ 64    Eric also argues that the evidence of his breach was lacking because the terms of the agreement were followed and FGMK performed the calculation. A reviewing court defers to the circuit court's findings of fact unless they are contrary to the manifest weight of the evidence. *Moy*, 371 Ill. App. 3d at 960. A decision is against the manifest weight of the evidence "only if the opposite conclusion is apparent or when findings appear to be arbitrary, unreasonable, or not based on the evidence." *Id.* Here, after listening to all the evidence and assessing the credibility of

witnesses, the circuit court found that Eric breached his fiduciary duty "by setting in motion a series of events *** with the express intent of depriving Plaintiff of an honest and fair repurchase price for his stock."

¶ 65     Eric's arguments to the contrary are about the witnesses' credibility. He argues there was no evidence that he personally took any action to influence FGMK or the valuation it produced. He argues there was no testimony that he directed Schwartz or Maron's other finance person, Lee, to influence FGMK or Polash's calculations. Eric cites his own testimony that he did not influence the accountants' work. Eric also cites Polash's testimony that Polash alone determined what to include under the category of reserves for contingent liabilities and that Polash did not speak to anyone at Maron until after issuing the valuation report. Eric also argues that the "brainstorming" e-mails with FGMK were taken out of context because Maron was negotiating a settlement amount with Kazemi and Maron was not contractually prohibited from speaking with its accountants about the terms of the shareholders' agreement. Eric contends that the circuit court, however, "improper[ly]" relied on the incredible testimony of his former assistant, Benson, as evidence that Eric had Schwartz communicate with FGMK in order to rig FGMK's work. According to Eric, not only were the "brainstorming" e-mails part of Schwartz's innocent and permissible work to reach a settlement with Kazemi, but also, the phone conversation that Benson testified she overheard "could not possibly have anything to do with FGMK's calculation *** since the purported conversation occurred more than a year prior to Kazemi resigning from Maron." Eric emphasizes Benson's testimony that she was not actively listening to the conversation as she went about her work tasks. Also, Schwartz and Eric testified that they were actually talking about the need for a shareholders' agreement with Kazemi, because they mistakenly believed at the time that he had

no contract, and their testimony was corroborated by the fact that a shareholders' agreement was drafted for his signature. Eric concludes these are numerous reasons to disregard Benson's testimony entirely.

¶ 66    Eric's argument is essentially that the defense witnesses were more credible than the plaintiff's witnesses. When findings of fact are based on the circuit court's credibility determinations, a reviewing court will defer to those findings unless they are against the manifest weight of the evidence. *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002). Eric has not met that standard. Unlike the other witnesses, Benson was a disinterested party with no stake in the outcome of the proceedings. Although she testified that she did not actively listen to the initial portion of the phone conversation in 2018, she testified that she did pay attention to what Eric said to Schwartz later in the conversation. She was listening when Eric told Schwartz that "there was no way he was going to pay" Kazemi the amount that he was entitled to under the shareholders' agreement and that Schwartz was going to "fix it." The circuit court assessed Benson's demeanor and found her to be "very credible" and that her testimony was corroborated by other evidence. The court also stated that even if it were to set aside Benson's testimony, "there was sufficient credible and compelling evidence indicating that [Eric] initiated the process to artificially deflate the value of Kazemi's shares." The court concluded that Eric had indeed "created and promoted a campaign to 'rig' the stock evaluation process by having *** Schwartz communicate and 'brainstorm' with the supposed independent accountants at FGMK to inflate 'contingent liabilities' in an unreasonable and improper manner so as to artificially eliminate the 'net worth' of Maron." Furthermore, neither the jury nor the judge apparently believed Schwartz's explanation that he "forgot" that there was an existing shareholders' agreement with Kazemi and so had a new one

drafted. Instead, this was seen as Schwartz's first attempt to "rig" Kazemi's buyout if he left the company. The circuit court also indicated that Schwartz's testimony added credibility to Benson's testimony, given that he admitted that items that were included as contingent liabilities in FGMK's valuation had never previously been treated in that way. The contemporaneous e-mails confirmed that Schwartz was talking with FGMK about ways to use contingent liabilities in order to unfairly reduce the stock price. This evidence supported the circuit court's finding that Eric encouraged Schwartz to mislead the accountants so that they would "torture[]" the meaning of "Net Worth" in order to produce an absurd result, and that this conduct justified punitive damages. Polash likewise testified that if Schwartz had told him that the intent of the shareholders' agreement was not to "protect the company" as Schwartz had informed him, then Polash would have thought about the calculation differently and might have changed his analysis. This was further evidence of Eric's role in manipulating what was supposed to be an independent and neutral process. Eric has failed to show that the manifest weight of the evidence is contrary to the trial judge's finding that Eric breached his fiduciary duty to Kazemi "by setting in motion a series of events *** with the express intent of depriving [Kazemi] of an honest and fair repurchase price for his stock." In short, the record does not substantiate Eric's contention that he neither owed nor breached fiduciary duties to Kazemi.

¶ 67   Maron argues that it was entitled to summary judgment on its counterclaim that Kazemi breached his fiduciary duties to the company by soliciting Maron employee Pore to join him at his new firm and by winning the bid for the Goldman Sachs project that Kazemi worked on while at Maron. As discussed previously, the denial of summary judgment has merged into the judgment after the trial and is not reviewable, but we may review Maron's arguments regarding the manifest

weight of the evidence. *Moy*, 371 Ill. App. 3d at 359-60. Maron's contention that Kazemi breached a fiduciary duty to Maron by "winning a bid for the Goldman Sachs project" is a bare statement without any subsequent supporting argument. Maron factually develops the argument in its reply brief. However, an appellant forfeits review of issues that are insufficiently presented in the opening brief. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (arguments not raised in the opening brief are considered forfeited and may not be raised in a reply brief, at oral arguments, or in a petition for rehearing); *Robinson*, 2025 IL App (1st) 232174, ¶ 39. Accordingly, this contention is forfeited. Furthermore, the manifest weight of the evidence does not indicate that the circuit court erred in determining that Kazemi did not breach a fiduciary duty to Maron with respect to Pore's departure from Maron. Maron contends that the circuit court "ignored" evidence that Pore told Kazemi that he was unhappy working at Maron and that instead of telling Maron's leadership that Pore was disgruntled so that Maron could retain Pore, Kazemi began soliciting Pore to help him form a competing business, in breach of Kazemi's duties to Maron. Although Maron failed to cite the location of its counterclaim in the record, we were able to locate it and confirm that Maron did not allege that Kazemi breached by not informing Maron's leadership that Pore was a disgruntled employee. Rather, Maron alleged that Kazemi breached by "encouraging Maron's employees, while he was still employed and a fiduciary of Maron, to leave Maron and join a competitor company which he was planning to join." This was the allegation that the circuit court addressed in the judgment order on appeal. After the jury trial, the circuit court ruled on the "remaining Bench/Non-Jury Counts" and found in relevant part:

> "As to Maron's claim that Kazemi breach[ed] a fiduciary duty to Maron by recruiting
>
> Jason Pore, the law is clear that an employee or shareholder can take steps to form a new

company or to compete in the future with their company, as long as that employee does not actively compete while still employed. The evidence was clear that Jason Pore, while he discussed his unhappiness with Maron (and specifically his unhappiness with Luke Fenner) and potential future plans with Kazemi while both were still employees of Maron, Pore testified that he was extremely unhappy with Maron's work environment and thinking of leaving long before he found out Kazemi was thinking of leaving. There was credible evidence that Pore was leaving Maron 'one way or another,' regardless of whether a job with Gurtz Electric ever materialized. Therefore, Maron did not sustain its burden of proof by the evidence to show that, more likely than not, Kazemi breached his fiduciary duty to Maron. Accordingly, judgment is entered against Maron and for Kazemi on Count I of the Counter-Claim."

¶ 68 Thus, the circuit court did not "ignore" Maron's actual allegation when ruling in Kazemi's favor on the counterclaim and Maron's attempt to now argue evidence that is irrelevant to its actual allegation is unpersuasive.

¶ 69 Alternatively, Eric argues that the circuit court improperly rejected his affirmative defenses of "waiver," "estoppel," and "unclean hands," stating that the jury had considered and rejected them, when the circuit court had actually prevented the jury from ever considering them. We rejected Maron's presentation of the affirmative defenses of "waiver" and "estoppel" above and we will not revisit them. As for the affirmative defense of "unclean hands," Eric argues that Kazemi breached his fiduciary duty to Maron and, therefore, Kazemi had "unclean hands" and could not sue Eric for breach of fiduciary duty. This argument is forfeited because Eric has cited an entire subsection of his Statement of Facts, rather than citing and discussing specific evidence

in support of his argument. An appellant forfeits review of issues that are insufficiently presented. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (arguments not raised in the opening brief are considered forfeited and may not be raised in a reply brief, at oral arguments, or in a petition for rehearing); *Robinson*, 2025 IL App (1st) 232174, ¶ 39.

¶ 70 Eric's other alternative argument is that the $4,121,299.42 punitive damages award was based on erroneous findings of wilful and wanton conduct. He essentially argues there is no credible evidence that he rigged the valuation process.

¶ 71 Punitive damages are not favored and are to be awarded with caution. *Glass v. Burkett*, 64 Ill. App. 3d 676, 682 (1978). They may be ordered if a breach of fiduciary duty is accompanied by "aggravating circumstances such as willfulness, wantonness, malice or oppression." *Id.* at 683. They are intended to punish the wrongdoer and deter that person and others from committing similar offenses in the future. *Id*. They are an appropriate means to punish and deter conduct where the defendant has engaged in an intentional breach of fiduciary duty. *Obermaier v. Obermaier*, 128 Ill. App. 3d 602, 610 (1984) (citing *Glass*, 64 Ill. App. 3d 676). The manifest weight of the evidence standard applies to a circuit court's findings in this instance. *Linhart v. Bridgeview Creek Development, Inc.*, 391 Ill. App. 3d 630, 641 (2009).

¶ 72 Eric's challenge to the punitive damages award consists of protests that there is "no evidence" that he influenced FGMK directly or indirectly and no evidence of any "rigging" whatsoever. However, the circuit court thoughtfully set out detailed factual findings that support its conclusion that Eric's breach was intentional, and it reaffirmed those findings when it rejected the post-trial motion and resolved the petition for attorney fees.

¶ 73 An abundance of evidence underpins the circuit court determination that Eric's conduct in

manipulating the share valuation process to Kazemi's detriment was wilful, wanton, and intentional. As the court explained, it found Benson to be "highly credible" and her testimony provided direct evidence of Eric's intent. Benson testified that Eric told Schwartz that there was "no way" he was going to pay Kazemi what he was owed and "you f***ed this up, you f***ing fix it." The court determined that "several other pieces of circumstantial evidence indicat[ed] that [Eric's] statements were likely made in response to a question or concern as to what Kazemi's payout would be should he separate from the company." Also, that Nixon's statements to Schwartz "indicated *a direct intent* that Schwartz should find a way to artificially deflate the value of Kazemi's shares." (Emphasis added.) The court found that the evidence was "clear that Eric Nixon created and promoted a campaign to 'rig' the stock evaluation process by having Maron personnel, specifically Don Schwartz, communicate and 'brainstorm' with the supposed independent accountants at FGMK to inflate 'contingent liabilities' in an unreasonable and improper manner such as to artificially eliminate the 'net worth' of Maron *** [thus] depriving Plaintiff of an honest and fair repurchase price for his stock." Furthermore, the court expressly found that "this process was, as shown by the evidence, intentionally done to deprive Plaintiff of an honest and fair repurchase price for his stock." The evidence led the circuit court to conclude: "Schwartz's communications with FGMK, and then FGMK's actions in finding, bluntly, some ridiculous scenarios to be a 'contingent liability,' all added up together to provide sufficient and reliable evidence of willful and wanton conduct."

¶ 74    The circuit court's determination that Eric wilfully, wantonly and intentionally interfered in the valuation process in order to deprive Kazemi of a fair repurchase price is well supported by the manifest weight of the evidence. The record is "replete with testimony and exhibits supporting

the \*\*\* finding that [Eric] acted intentionally" because his actions were "lacking in good faith, underhanded, deceitful and sly." *Levy*, 268 Ill. App. 3d at 380. This type of wilful breach of a fiduciary duty supports the circuit court's decision to award punitive damages. *Id.*

¶ 75    "A ruling is against the manifest weight of the evidence if it is arbitrary, unreasonable, arbitrary and not based on the evidence, or when the opposite conclusion is clearly evident from the record." *Tully v. McLean*, 409 Ill. App. 3d 659, 670 (2011). We defer to the circuit court as the finder of fact "because it is in the best position to observe the conduct and demeanor of the parties and the witnesses." *Id.* Furthermore, a reviewing court "may not substitute [its] judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *Id.* Eric has not shown that the award of punitive damages was contrary to the manifest weight of the evidence.

¶ 76    The next two contentions concern the attorney fees that were included in the punitive damages award. The punitive damages consisted of $1.5 million and "an amount to be determined should [Kazemi] choose to file an Attorney Fee Petition." On the basis of Kazemi's subsequent attorney fee petition, Eric's written response, and Kazemi's written reply, the circuit court determined that the following amounts totaling $2,621,299.42 were fair and reasonable: $16,728 for Kazemi's first attorney, $2,555,667 for his second attorney, and $48,904.42 for the expenses and costs.

¶ 77    The circuit court may consider an element of punitive damages to be the amount of the plaintiff's attorney fees. *Glass v. Burkett*, 64 Ill. App. 3d 676, 683 (1978).

> "Wrongful conduct of the defendant, which has been characterized as either wilful, wanton, malicious or oppressive, is the root of all cases where litigation expenses have

been allowed as an exception to the general rule that litigation expenses are not allowable to the successful party in the absence of a statute or in the absence of some agreement or stipulation specifically authorizing them." *Id.*

¶ 78 Eric contends that the court impermissibly awarded punitive damages twice. Attorney fees cannot be awarded "as a separate entity distinct from punitive damages." *Id.*; *Russow v. Bobola*, 2 Ill. App. 3d 837, 843 (1972) ("When an award of punitive damages is authorized, expenses and attorney fees may be considered in estimating the amount of damages but are not allowable in addition to the sum assessed as exemplary damages."). However, the attorney fees were not a second or separate award of punitive damages. The court ordered that punitive damages would consist of two components, the first of which was $1.5 million and the second of which was "an amount to be determined [on the basis of a fee petition]." Furthermore, Eric made the same argument in response to the fee petition and the circuit court stated then that Eric "confuse[s] the intent of this Court's 2/25/25 Order *** which awarded attorneys' fees and costs simultaneously with the [1.5 million] award of punitive damages." The circuit court also said:

"The only caveat separating the fees/costs from the punitive damages award was that the Court would need to see a Petition establishing the foundation for any such fees, and thus invited Plaintiff to file such a Petition if he so chose. The award of fees/costs was part and parcel of the same finding of vexatious conduct on Defendant's part and was not separate and distinct. In the case cited by Defendants, *Glass v. Burkett*, that is exactly what the appellate court did in inferring the intent of the trial court to award fees/costs simultaneously with punitive damages as part of the same damages award. The only difference in the *Glass* case was that the Court apparently had received competent evidence

of the actual fees/costs at that point, but that is a distinction without a difference here."

¶ 79    Thus, it is disingenuous of Eric to argue on appeal that the circuit court granted punitive damages twice.

¶ 80    Eric's second contention regarding the attorney fees is that it was improper to base some of the award on Kazemi's contingency fee agreement with counsel instead of applying the lodestar method. This is the full extent of Eric's argument, so it is forfeited due to his failure to develop it with any supporting authority. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (arguments not raised in the opening brief are considered forfeited and may not be raised in a reply brief, at oral arguments, or in a petition for rehearing); *Robinson*, 2025 IL App (1st) 232174, ¶ 39.

¶ 81    Finally, Eric adopts Maron's unpersuasive argument that the circuit court erred in denying *remittitur* of the award against Eric. As discussed above, the circuit court did not err in denying *remittitur*.

¶ 82    Having rejected all of the appellants' arguments, we affirm the judgment on appeal.

¶ 83    Affirmed.